**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

---

THOMAS BEALE, :
        Plaintiff, :
:
        v. :    Civil No. 2:20-cv-05137-JMG
:
MARIROSA LAMAS, Superintendent, :
SCI-Chester, *et al.*, :
        Defendants. :

---

**MEMORANDUM OPINION**

GALLAGHER, J.                                 **May 21, 2024**

    *Pro se* Plaintiff is currently incarcerated at a Pennsylvania state correctional institution. He has brought the instant action in which he asserts several constitutional violations under 42 U.S.C. § 1983 against numerous correctional employees and a doctor contracted to provide medical services at the plaintiff's correctional institution. Plaintiff asserts Eighth Amendment claims for deliberate indifference, equal protection claims, and First Amendment retaliation claims. Both the doctor and the state correctional employees have filed Motions for Summary Judgment. For the reasons set forth below, the Court will grant the doctor's Motion for Summary Judgment, and grant in part and deny in part the state correctional employees' Motion for Summary Judgment.

**I.      PROCEDURAL HISTORY**

        **A.      Initiation of This Action Through the Filing of an Amended Complaint**

    *Pro se* Plaintiff, Thomas Beale ("Beale"), an individual incarcerated at SCI-Chester, commenced this action in an unusual fashion by filing only a Motion for a Preliminary Injunction, which the Clerk of Court docketed on October 13, 2020. *See* ECF No. 1. The Motion contained a single claim for injunctive relief, namely, Beale sought an order requiring Dr. Paul G. Little, a

physician at SCI-Chester, to place him back on Singulair, a medication to help him address his chronic asthma. *See id.* at ECF p. 1.[1] Beale asserted that he was entitled to this medication pursuant to a prior order by then-Magistrate Judge Susan P. Baxter of the United States District Court of the Western District of Pennsylvania ("WDPA"). *See* Br. in Supp. of Mot. for Prelim. Inj. at ECF pp. 3–4.[2]

Although Beale sought preliminary injunctive relief, he neither filed a complaint along with the Motion, nor did he file an application for leave to proceed *in forma pauperis* or remit the fees necessary to commence a civil action. As such, Judge Edward G. Smith, now deceased, entered an Order on October 26, 2020, requiring Beale to remit the fees or seek leave to proceed *in forma pauperis* and file a complaint within 30 days of the date of the Order. *See* ECF No. 3. Beale, after receiving an extension of time to comply with the Order, filed an Application for Leave to Proceed *In Forma Pauperis* ("IFP Application"), a Prisoner Trust Fund Account Statement, a Motion for Appointment of Counsel, and a Complaint, all of which the Clerk of Court docketed on December 29, 2020. *See* ECF Nos. 6–9.

In the Complaint, Beale named the following individuals as Defendants in their individual and official capacities: (1) Marirosa Lamas, Superintendent of SCI-Chester ("Superintendent Lamas"); (2) Kenneth Eason, Deputy Superintendent of Facility Management at SCI-Chester ("D.S. Eason"); (3) Mark Wahl, Deputy Superintendent, Centralized Service at SCI-Chester ("D.S. Wahl"); (4) Patricia Connor-Council, Unit Manager at SCI-Chester ("U.M. Connor-Council"); (5) Michael Selby, Unit Manager at SCI-Chester ("U.M. Selby"); (6) Shirley Law-Smith, Corrections

---

[1] Beale also identified Alicia Ross, Correctional Health Care Administrator at SCI-Chester ("Nurse Ross"), as a Defendant in the caption of the Motion. *See id.*
[2] Beale's Brief starts on ECF p. 3 of ECF No. 1. Beale alleged that this WDPA action was docketed at Civil Action No. 13-15. Judge Baxter is now a District Judge.

Health Care Administrator at SCI-Chester ("Laws-Smith");[3] (7) Nurse Ross; (8) SCI-Chester Corrections Officers E. Goode-Williams ("C.O. Goode-Williams"), T. Winstead ("C.O. Winstead"), M. White III ("C.O. White"), P.W. DeVane ("C.O. DeVane"), J. Lees ("C.O. Lees"), T.J. Karasinski (C.O. Karasinski"), and S. Parker ("C.O. Parker"); (9) "Food Service Supervisor Blanford" ("Blanford"); and (10) Dr. Little. *See* Compl. at ECF pp. 1–2, ECF No. 9. For his causes of actions, Beale asserted claims under 42 U.S.C. § 1983 for cruel and unusual punishment and deliberate indifference to his serious medical needs in violation of the Eighth Amendment. *See id.* at ECF pp. 3, 35–36. Beale alleged that Defendants violated his Eighth Amendment rights by (1) denying him his prescribed Singulair for treatment of his chronic asthma, *see id.* at ECF pp. 29–32; (2) causing him to experience prolonged exposure to tobacco smoke from March to May 2019, *see id.* at ECF pp. 7–13; (3) causing him to experience prolonged exposure to extremely cold temperatures from November 2018 through December 2019, *see id.* at ECF pp. 13–24; and (4) denying him meals to accommodate his dietary needs in May, July, August, and November 2020. *See id.* at ECF pp. 24–29.

On January 19, 2021, Judge Smith entered an order denying Beale's Motion for a Preliminary Injunction and IFP Application, with the latter denial being based on Beale's prisoner account statement showing that he had sufficient funds to pay the filing fee in the case. *See* ECF No. 10. Judge Smith gave Beale 30 days to remit the filing fee. *See id.* Beale remitted the filing fee to the Clerk of Court on February 23, 2021. *See* Unnumbered ECF Entry Between ECF Nos. 13 and 14.

---

[3] As explained *infra*, Beale later corrected the spelling of this defendant's last name to "Laws-Smith."

With Beale having remitted the filing fee, Judge Smith screened the Complaint under 28 U.S.C. § 1915A. However, prior to Judge Smith completing this statutory screening, Beale filed another Motion for a Preliminary Injunction relating to his asthma medication, which the Clerk of Court docketed on September 10, 2021. *See* ECF No. 17. This Motion sought to have the Court direct Dr. Arlene Seid, who appeared to be a doctor working in Pennsylvania's Department of Corrections ("DOC"), to place Beale back on his asthma medications, Dulera 200 and Ventolin. *See id.*

Judge Smith completed the screening of the Complaint under section 1915A and entered an Order on September 29, 2021, which, *inter alia*, (1) dismissed without prejudice Beale's official capacity claims against Defendants who are officials or employees of SCI Chester, (2) allowed Beale's remaining claims to pass statutory screening, (3) granted Beale's Motion for Appointment of Counsel and referred the case to the Court's Prisoner Civil Rights Panel to attempt to locate counsel for Beale, and (4) denied without prejudice Beale's new Motion for a Preliminary Injunction. *See* Sept. 29, 2021 Order at 1–5, ECF No. 18.[4] Concerning the Motion for a Preliminary Injunction, Judge Smith denied the Motion because Beale sought injunctive relief against an individual, Dr. Seid, who was not named as a Defendant in the Complaint. *See id.* at 5 n.3.

Seemingly due to Judge Smith's recognition of Beale seeking relief against non-defendants, Beale filed a Motion to file an Amended Complaint, which the Clerk of Court docketed on November 4, 2021. *See* ECF No. 40. Judge Smith held an on-the-record telephone conference to discuss this Motion on December 2, 2021. *See* ECF No. 50. The following day, Judge Smith

---

[4] No member of the Panel ultimately agreed to represent Beale in this matter, and Judge Smith removed it from the Panel on February 8, 2023. *See* ECF No. 121.

entered an Order granting Beale's Motion and giving him until December 17, 2021, to file an amended complaint. *See* ECF No. 51.

The Clerk of Court docketed Beale's 118-page Amended Complaint, along with almost 600 pages of exhibits, on December 10, 2021. *See* ECF Nos. 54, 55. Along with most of the Defendants named in his original Complaint, Beale named several new defendants in the Amended Complaint, including: (1) Madeline Quinn, Grievance Coordinator at SCI-Chester ("G.C. Quinn"); (2) G. Arais, Security Lieutenant at SCI-Chester ("Lt. Arais"); (3) R. Govaeea, Fire Safety Manager at SCI-Chester; (4) Neko Bourne, Unit Manager at SCI-Chester ("U.M. Bourne"); (5) Jaclyn Nealy, Unit Manager at SCI-Chester ("U.M. Nealy"); (6) A. McCown, Unit Manager at SCI-Chester ("U.M. McCown"); (7) SCI-Chester Corrections Officers R. Lyons ("C.O. Lyons") and J. Norris ("C.O. Norris"); (8) Dr. Seid, whom he identified as Chief of Clinical Service, Central Office; and (9) "All Food Service Supervisors." Am. Compl. at ECF p. 5, ECF No. 54. Beale no longer identified C.O. White and Blanford as Defendants.[5] *See id.* at ECF pp. 5, 11–12. Beale further appeared to provide additional identifying information for several of the SCI-Chester corrections officer defendants and altered the last name of another defendant. *See id.*[6]

Regarding his causes of action, Beale once again asserted several causes of action for constitutional violations under section 1983 against the Defendants in their official and individual capacities. *See id.* at ECF pp. 5, 6. Those causes of action and supporting factual allegations are as follows:[7]

---

[5] Hereinafter, the Court collectively refers to all Defendants other than Dr. Seid and Dr. Little as the "SCI-Chester Defendants."

[6] Beale modified the names of C.O. Goode-Williams, C.O. Winstead, C.O. Lees, C.O. Karasinski, C.O. Parker, and C.O. DeVane. *See id.* Beale also changed the last name of Law-Smith to "Laws-Smith." *Id.*

[7] Ordinarily, the Court would not provide this level of specificity when referencing allegations in an operative complaint when resolving motions for summary judgment. However, because Beale

<u>Eighth and Fourteenth Amendment Violations for Allowing Tobacco Smoke at Smokeless
Corrections Facility</u>

In late-November 2013, Beale was transferred from another Pennsylvania State Corrections Facility to SCI-Chester because he is highly allergic to tobacco smoke and SCI-Chester is designated as a non-smoking institution. *See id.* at ¶¶ 21–22. Despite this non-smoking designation, Beale experienced incidents where he smelled and observed environmental tobacco smoke ("ETS") while he was in his unit at SCI-Chester from late-February 2019 through the end of December 2020. *See id.* at ECF pp. 12–19.

On February 26, 2019, Beale was in the day room of his housing unit when he smelled and observed ETS. *See id.* at ¶ 22. In response to the ETS, Beale began to cough uncontrollably. *See id.* Consequently, he asked C.O. Parker to let him back into his cell. *See id.* C.O. Parker asked Beale why he was coughing, and he pointed up to the ETS appearing in the dayroom. *See id.* Beale asked C.O. Parker if she could see the ETS, and she nodded her head, "yes." *Id.* Although she saw the ETS, C.O. Parker took no action to enforce SCI-Chester's non-smoking policy. *See id.* Beale ultimately returned to his cell where he felt dizzy, suffered from side and chest pains, and experienced nausea. *See id.*

Beale again smelled and observed ETS in his housing unit on March 7, 2019. *See id.* at ¶ 23. At this time, Superintendent Lamas and "Security Lieutenant Allen" were in the unit area. *See id.* Beale tried to speak to them, but they refused to allow him to talk. *See id.* This caused Beale to

---

sued so many defendants and included factual allegations covering an almost-two-year period, referencing Beale's specific allegations against each named defendant is very pertinent to analyzing the factual record in support of Beale's claims in resolving the instant Motions for Summary Judgment. In addition, and as explained *infra*, Beale relies significantly on the Amended Complaint in responding to one of the Motions for Summary Judgment.

inform a corrections officer[8] about the ETS, but this corrections officer did not speak to Superintendent Lamas and her colleague, investigate the ETS, or take any action to enforce the non-smoking policy. *See id.* Nevertheless, Beale was apparently able to speak to Superintendent Lamas before she left the unit area, and she informed him that "she and the Deputies were trying to do something about it, but it was difficult to keep the ETS from "coming in." *Id.*

In the afternoon of March 10, 2019, Beale observed ETS on his housing unit both prior to, and after, a lockdown. *See id.* at ¶¶ 24–25. Beale informed C.O. Lyons about the ETS, and even though C.O. Lyons told Beale that the ETS bothered him as well, C.O. Lyons took no action to investigate the ETS or enforce the non-smoking policy. *See id.* Due to the exposure to the ETS, Beale "retreated to his cell," where he proceeded to feel dizzy, cough uncontrollably, and suffer nausea, side pains, and chest pains. *See id.* at ¶ 25.

Once Beale was back in his cell, C.O. Lyons contacted him over the intercom to inquire how Beale was doing. *See id.* at ¶ 26. Beale informed C.O. Lyons that he did not want to die from the ETS, and he felt that no one at SCI-Chester was doing anything about it. *See id.* C.O. Lyons informed Beale that it was essentially up to the "higher ups," and there was nothing he could do about it. *See id.* C.O. Lyons never conducted any investigation or attempted to enforce the non-smoking policy after communicating with Beale. *See id.*

The following day, Beale smelled and observed ETS in his housing unit upon his return from work. *See id.* at ¶ 27. Beale started coughing uncontrollably and notified a corrections officer

---

[8] Beale identifies numerous individuals in the Amended Complaint who are not named as defendants. To the extent possible, the Court only identifies the name of the non-defendant to the extent doing so is necessary to fully understand Beale's claims. Otherwise, these non-defendants are identified by their job title.

that he needed to return to his cell. *See id.* The corrections officer allowed Beale to return to his

cell, but did not do anything to investigate the ETS or enforce the non-smoking policy. *See id.*

At some point during the next day, Beale filed a grievance about the ETS. *See id.* at ¶ 28.[9]

In his grievance, Beale indicated that he had spoken to "Security Lieutenant Sprinkle" and D.S.

Wahl, both of whom essentially told him that everyone smokes and there was nothing they could

do about the ETS. *See id.* at ¶ 29.[10]

On March 27, 2019, Beale overheard C.O. Goode-Williams talking to another inmate after

catching the inmate smoking. *See id.* at ¶ 31. C.O. Goode-Williams informed the other inmate that

he should "write [him] up." *Id.* C.O. Goode-Williams also told this inmate that he should not smoke

while he is working; rather, the inmate should "do it on another shift." *Id.*

Beale smelled and observed ETS in his housing unit again on April 17, 25, 28, and 29,

2019. *See id.* at ¶¶ 37–41. Beale complained about the ETS to C.Os. Winstead, White, DeVane,

and Lees and DeVane, respectively. *See id.* None of these corrections officers conducted any

investigation in response to Beale's complaints, despite at least C.Os. DeVane and Lees

acknowledging that there was ETS in the housing unit. *See id.* During these experiences with the

ETS, Beale suffered from dizziness, uncontrollable coughing, side pains, chest pains, and nausea.

*See id.*

---

[9] This grievance was ultimately denied and the denial was upheld on appeal. *See id.* at ¶¶ 32–35, 46, 48. As part of his final appeal, Beale asserted that U.M. Selby told him that "the only way tobacco smoke comes through the vents is if someone's smoking in the Mezzanine [sic]." *Id.* at ¶ 35. Beale claims that only staff are permitted on the mezzanine. *See id.* As such, he believes SCI-Chester staff must be smoking in the facility. *See id.*

[10] Concerning grievances generally, as pointed out *infra*, Beale is a prolific grievance filer at SCI-Chester. He attached some of those grievances to the Amended Complaint, and he appears to have kept a list of grievances he filed, along with the results of those grievances. *See* ECF No. 55 ("Am. Compl. Exs.") at ECF pp. 149–53. For the most part, the Court discusses those grievances later in this Memorandum Opinion while addressing the arguments in the Motions for Summary Judgment.

On May 1 and 2, 2019, Beale's housing unit strongly smelled of ETS. *See id.* at ¶¶ 42–43. Despite Beale's complaints to C.O. Karasinski on May 1st, and C.Os. Karasinski and Winstead on May 2nd, no one investigated the ETS source or enforced the non-smoking policy. *See id.*

On May 21, 2019, Beale returned to his cell after work and noticed a strong ETS smell "between 5 to 16 cells." *See id.* at ¶ 44. Beale then hurried to the kiosk on the housing unit to get his tablet, but he was overcome by the ETS, got dizzy, and sat on the floor so he did not fall and hurt himself. *See id.* Someone told Beale he passed out, and "Medical" was called to care for him. *See id.* at ¶¶ 44–45. A nurse responded to his location and was trying to get him to stand up. *See id.* at ¶ 45. Beale was too weak to stand, so he was transported to Medical, where they took his vitals and gave him an EKG. *See id.* Beale complained to them that he believed he experienced a "Raynaud's attack," but the nurses did not do anything about it. *See id.* Instead, because he was covered in hives, they offered him Benadryl, which he declined. *See id.*

On December 31, 2020, Beale saw smoke coming through the ventilation system. *See id.* at ¶ 49. It smelled like burning wood. *See id.* Beale covered the vent to "prevent an incident." *Id.*[11]

<u>Eighth Amendment Violations for Cold Temperatures at SCI-Chester</u>

Beale has a "Memo" dated November 26, 2013, indicating that he must remain warm at all times. *See id.* at ¶ 58; *see also* Am. Compl. Exs. at ECF p. 211.[12] Despite the need/requirement to

---

[11] This was the last specific date of an ETS/smoke incident identified in the Amended Complaint. Nevertheless, Beale did appear to incorporate dates and times of exposure to ETS he logged in his composition books, copies of which he asserted he attached as an exhibit to the Amended Complaint. *See* Am. Compl. at ¶¶ 48–51 (citing "Comp. Bk." 15 through 20). Although Beale submitted copies of what appear to be pages from composition books as exhibits to his Amended Complaint, *see* Am. Compl. Exs. at ECF pp. 260–465, they are, in most instances, entirely illegible. *See id.* To the extent they are legible, it is very often unclear what they mean or how they support Beale's claims. *See id.*

[12] In support of this factual allegation, Beale cites to exhibit M-1 to the Amended Complaint. *See* Am. Compl. at ¶ 58. Although Beale identifies exhibit M-1 as a "Memo," this exhibit is actually a January 17, 2014 email from Malikka Saeed, RN. *See* Am. Compl. Exs. at ECF p. 211. It

stay warm, the inmate areas of SCI-Chester have lacked heat during the fall, winter, and beginning

of spring months during the entire time he has been incarcerated there. *See id.* at ¶¶ 54. Beale

believes he contracted Raynaud's Phenomenon "from the mixture of tobacco smoke and the

constant coldness of SCI-Chester." *Id.*[13]

On November 27, 2018, the cold temperatures at SCI-Chester affected Beale's feet and

legs. *See id.* at ¶ 55. He noticed that they "had dried out and began to crack and bleed" due to the

"extremely cold temperature." *Id.*

Concerning his complaints about the cold temperature, Beale submitted a Request to Staff

to D.S. Wahl and U.M. Connor-Council on December 5, 2018. *See id.* at ¶ 57. Beale also submitted

a grievance about the cold temperature on December 12, 2018, which U.M. Selby initially denied

on January 15, 2019, after explaining to Beale that he had traversed through SCI-Chester and found

---

nevertheless does state what Beale alleges insofar as it directs that Beale "remain warm at all
times." *Id.*

[13] Throughout the Amended Complaint and its attachments, there are references to Raynaud's
disease and Raynaud's phenomenon, although the latter is referenced more frequently. *See, e.g.*,
Am. Compl. at ¶ 1 (referring to "Raynaud's Phenomenon [sic] disease"); *id.* at ¶ 6 (referring to
Raynaud's phenomenon); Am. Compl. Exs. at ECF pp. 234–41 (print out discussing Raynaud's
phenomenon and Raynaud's disease). Both Raynaud's disease and Raynaud's phenomenon appear
to be generally related to Raynaud's Syndrome, and the three diagnoses are distinguished as
follows:

- Raynaud's disease: Occurs on its own and isn't connected with another disease
  or condition. This is also called primary Raynaud's syndrome.

- Raynaud's phenomenon: Occurs due to an underlying condition, medication or
  lifestyle factor. This is also called secondary Raynaud's syndrome.

- Raynaud's syndrome: Refers to either the primary or secondary form of the
  condition.

Raynaud's Syndrome, Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/9849-
raynauds-phenomenon (last visited Mar. 28, 2024). Because it is unclear which diagnosis Beale
actually received (despite his references to Raynaud's phenomenon), the Court will refer to this
condition as "Raynaud's."

the temperature to be acceptable. *See id.* at ¶¶ 57, 59. Beale appealed from this decision, but it appears his appeal was denied. *See id.* at ¶¶ 62–63, 66.

At some point in January 2019, D.S. Eason and U.M. Connor-Council visited Beale's cell as well as the cells of two other inmates, and they "found it difficult to stay in those cells because of the coldness of them." *Id.* at ¶ 64. D.S. Eason agreed that the cells were too cold and told Beale he would see what he could do. *See id.*

On March 18, 2019, Beale noticed that the air conditioning was "turned up from the normal temperature." *Id.* at ¶ 68. Another inmate who worked in maintenance told Beale that U.M. Selby was the one who "turned up" the air conditioning. *See id.*

In mid-to-late-March 2019, Beale submitted sick call slips due to how the coldness was impacting his hands and fingers in particular. *See id.* at ¶¶ 67, 69.[14] Beale's "fingers felt like they were being torn apart when he reached out for something," and he had "continuous burning in his hands." *Id.* at ¶ 67. When Beale explained his symptoms to physician's assistant Nicholson ("P.A. Nicholson"), he told Beale that he had "Raynaud's Phenomenon [sic], a disease of the hands and feet (appendages) brought on by prolonged exposure to cold conditions and tobacco smoke." *Id.* at ¶ 69. On a latter occasion in March, P.A. Nicholson saw Beale in Medical and saw that Beale's finger was fractured. *See id.* at ¶ 72. P.A. Nicholson told Beale that he would speak to Dr. Little about Raynaud's. *See id.*

During April 2019, Beale continued to experience cold temperatures in his housing unit and submitted several sick-call slips relating to issues and pain in his hands. *See id.* at ECF pp. 22–25. On April 3, 2019, P.A. Nicholson prescribed 2.5 mg of Amlodipine, which Beale was supposed

---

[14] Beale claims that the air conditioning was "turned up" on March 29, 2019, "to get inmates sick so [SCI-Chester] could make money through 'sick-call' for inmate's Co-Payments [sic]." *Id.* at ¶73.

to take twice a day for 30 days so the blood vessels in his hands would dilate. *See id.* at ¶ 75. On April 9, 2019, Beale was transported to an outside medical clinic for his fractured finger. *See id.* at ¶ 80. The doctor initially informed Beale that he would need an operation to properly set his fractured finger; however, once Beale told the doctor he had Raynaud's, the doctor said, "he could only put a splint on [Beale's] finger and hope it would straighten properly." *Id.*

Beale saw a doctor at SCI-Chester about his hands on April 18, 2019. *See id.* at ¶ 90. After Beale explained his symptoms, the doctor told him "he would 'push' for [Beale] to get gloves" for the Raynaud's. *See id.* Laws-Smith was to order the gloves for Beale. *See id.* Beale offered to speed up the process by paying for the gloves himself, but his request was denied. *See id.*

The cold temperatures at SCI-Chester and Beale's resulting medical issues continued into May 2019. *See id.* at ECF pp. 26–27. On May 13, 2019, D.S. Eason, U.M. Selby, a SCI-Chester accountant, and another SCI-Chester maintenance supervisor came onto Beale's housing unit. *See id.* at ¶ 99. During this visit, Beale and the "Unit Officer" complained to them that it was freezing in the housing unit. *See id.* Beale, who had purchased a thermometer to keep track of the temperature outside and inside his cell, informed D.S. Eason that it was 35 degrees inside his cell. *See id.* at ¶¶ 98–99.

When D.S. Eason's group was leaving the housing unit, the accountant noticed Beale was wearing gloves. *See id.* at ¶ 100. The accountant asked Beale "in a sarcastic way" whether he was cold, and laughed about it. *See id.* at ¶¶ 100–01. The accountant then walked away where he later saw Superintendent Lamas. *See id.* at ¶ 101. Beale could hear Superintendent Lamas "scolding [the accountant] for his comments and laughter concerning [Beale's] condition." *Id.*

On May 16, 2019, Dr. Little saw Beale after Beale had submitted a sick call slip because of weakness in his right arm and both hands. *See id.* at ¶¶ 103–04. During this visit, Dr. Little

increased Beale's Amlodipine dosage. *See id.* at ¶ 104. He diagnosed Beale's pain and weakness as tendonitis and prescribed Tylenol for the pain. *See id.* He also told Beale he would have gloves ordered for Beale's Raynaud's. *See id.* Two days after this visit, Beale received the new dosage of Amlodipine, as well as 500 mg of Acetaminophen, "a substitute for Tylenol." *Id.* at ¶ 105.

In late July 2019, Beale was returning to his cell after lunch when other inmates informed him that an unknown corrections-officer-in-training had entered his cell while Beale was gone. *See id.* at ¶ 107. Beale checked inside his cell, and he did not initially notice anything out of place. *See id.* Nonetheless, on the following day, Beale went to record the morning's weather and noticed that his thermometer was missing. *See id.* at ¶ 108. Beale believes that D.S. Eason sent the officer-in-training into Beale's cell to remove the thermometer. *See id.*

As August 2019 approached, Beale still had not received gloves for his Raynaud's Phenomenon. *See id.* at ECF p. 28. During a visit with P.A. Nicholson relating to another medical issue on August 26, 2019, Beale asked him about the gloves. *See id.* at ¶ 109. P.A. Nicholson checked and could not find a record of anyone placing an order for gloves. *See id.* As a result, P.A. Nicholson told Beale that he would check with Dr. Little about the gloves. *See id.*

During visits at Medical on September 19 and 22, 2019, two nurses asked Beale about whether he had received the gloves. *See id.* at ¶¶ 110–11. Beale informed the nurses that he had not yet received the gloves. *See id.* Beale then saw Dr. Little on September 23, 2019, when he went to Medical to discuss the results of prior blood work. *See id.* at ¶ 112. Beale asked Dr. Little about why he had not yet received the gloves, and Dr. Little told him that "the process took a long time." *Id.*

Due to not yet having received the gloves, Beale submitted a Request to Staff to Laws-Smith on October 2, 2019. *See id.* at ¶ 113. Later that day, Beale was called to Medical, where he

saw a nurse. *See id.* at ¶ 114. The nurse provided Beale with a pair of "blue Garden Gloves instead of thermal gloves." *Id.* The following day, Beale saw Dr. Little at Medical. *See id.* at ¶ 115. Dr. Little gave Beale a "Med-Card for the gloves . . . so [he] would not have a problem wearing the gloves 'at all times' throughout the institution." *Id.*

On October 7, 2019, C.O. Lees and Corrections Officer Rodriguez ("C.O. Rodriguez") arrived at Beale's cell to conduct a cell search. *See id.* at ¶ 117. Beale showed C.O. Rodriguez his "Memo," which requires him to be warm at all times, and he asked to see the Lieutenant so he would be permitted to wear thermals outside of his cell. *See id.* C.O. Lees told Beale that he did not need thermals because he and C.O. Rodriguez would stay long in Beale's cell. *See id.* They then cuffed Beale, who was wearing boxers and a t-shirt, in a standing position outside of his cell. *See id.* at ¶ 118. After three minutes, Beale started uncontrollably shaking. *See id.* Beale that he then collapsed. *See id.* A nurse arrived to perform chest compressions until Beale regained consciousness. *See id.* at ¶ 120.

Another corrections officer, J. Long ("C.O. Long") arrived at Beale's cell to check on C.Os. Lees and Rodriguez. *See id.* at ¶ 119. Upon seeing Beale, C.O. Long asked C.Os. Lees and Rodriguez why they had Beale outside of his cell in boxers and a t-shirt because they knew he cannot take the cold temperature. *See id.* Beale was later transported to Medical, where they took his vitals and gave him an EKG. *See id.* at ¶ 120. Beale then returned to his housing unit. *See id.*

In late December 2020, Beale attempted to get different gloves for his Raynaud's. *See id.* at ¶¶ 122–23. On December 28, 2020, Beale saw P.A. Nicholson, and showed him that the gloves he received on October 2, 2019, had melted together. *See id.* at ¶ 123. Beale told P.A. Nicholson that due to the melting of the gloves, he had to "double up commissary gloves." *Id.* P.A. Nicholson told Beale that he would see what he could do. *See id.*

On February 15, 2021, Beale was in the Restricted Housing Unit ("RHU"), and the cold temperature there caused the skin on the bottom of his feet to crack and bleed. *See id.* at ¶ 127. The following day, Beale saw P.A. Nicholson about his feet. *See id.* at ¶ 128. P.A. Nicholson prescribed corticosterone cream for Beale and told Beale he would receive the cream in three days. *See id.*

Later in February 2021, Beale saw Nurse Ross to discuss grievances he had filed relating to re-fills for his asthma pump. *See id.* at ¶ 129. During Nurse Ross's conversation with Beale, she told him that she found a pair of gloves for his hands. *See id.* Beale explained to Ross that the gloves he received on October 2, 2019 were ineffective. *See id.* Ross told Beale that the gloves she found were compression gloves specifically designed for arthritis and Raynaud's. *See id.*

By late April 2021, Beale had not received the gloves Nurse Ross said she found for him. *See id.* at ¶¶ 131–32. As a result, he filed a Request to Staff to Nurse Ross concerning those gloves. *See id.* at ¶ 131. Beale explained in the request that he was still experiencing excruciating pain from the "onset attacks." *Id.*

Beale received a response from Nurse Ross on May 14, 2021. *See id.* at ¶ 132. She informed Beale that she was told that the gloves were ordered and another SCI-Chester employee was tracking the package. *See id.* She also told Beale that he would receive the gloves "ASAP." *Id.* Beale received the new gloves on May 19, 2021. *See id.* at ¶ 133.

<u>Eighth Amendment Violations for Meals Not Corresponding to Dietary Needs</u>

Beale has a "No Onion/No Pepper/No Fish" diet because of his allergies to seafood, peppers, and onions. *Id.* at ¶ 135. To accommodate Beale's issues with onions and peppers, SCI-

15

Chester provided Beale with a GERD diet. *See id.* at ¶¶ 135–36.[15] Beale's food requirements were well known at SCI-Chester. *See id.* at ¶ 135. Yet, Beale experienced several issues with his meals between mid-May 2020 and early May 2021:

- On May 15, 2020, January 1, 2021, April 30, 2021, Beale missed a meal when he was unable to eat the meals brought to him because they contained fish, peppers, or onions. *See id.* at ECF pp. 32–33, 37, 40.

- On July 24, 2020, July 31, 2020, August 3, 2020, August 6, 2020, February 24, 2021, and February 28, 2021, Beale missed a meal because diet trays were not available for him when he went to get his food. *See id.* at ECF pp. 33–35, 38–39.

- Beale had an appropriate dietary tray belatedly brought to him for a dinner meal on February 24, 2021, and a lunch meal on February 28, 2021. *See id.* at ECF p. 38.

- On November 27, 2020, Beale received a dinner meal tray which contained only carrots and potatoes. *See id.* at ¶ 150. Although this tray was taken away, no other meal tray was brought for him to eat dinner. *See id.*

- On May 1, 2021, Beale did not receive pumpkin pie as did other individuals who received diet meals. *See id.* at ¶ 170.

- On the late afternoon of February 23, 2021, Beale did not have a GERD meal available to him when the meal cart arrived. *See id.* at ¶ 206. He was told that there was no GERD meal

---

[15] GERD is an acronym for gastroesophageal reflux disease, "a syndrome due to structural or functional incompetence of the lower esophageal sphincter . . ., which permits retrograde flow of acidic gastric juice into the esophagus." *Gastroesophageal Reflux Disease (GERD)*, Stedman's Medical Dictionary (2014).

because his meal card had expired. *See id.*[16] The card expired despite Beale having submitted sick-call slips for a renewed diet card on three occasions. *See id.*

Beale believes that he was denied meals, or portions of meals, such as the pumpkin pie which should have been part of his meal on May 1, 2021, as retaliation because he filed grievances against the kitchen over missing meals and inappropriate meals provided to him. *See id.* at ¶ 170; *see also id.* at ECF pp. 32–44 (describing grievances filed about meals). SCI-Chester administration denied that any retaliation occurred. *See, e.g.*, *id.* at ECF p. 44 (explaining there was no evidence of retaliation by dietary staff).

<u>Eighth Amendment Violations Pertaining to Denials of Medication for Asthma and Other Medical Issues</u>

Beale was diagnosed with chronic asthma on March 12, 2012. *See id.* at ¶ 183. From that date, through early April 2021, Beale was prescribed 19 different medications, including Singulair, to help treat his asthma. *See id.* at ECF pp. 44–47. At one point, Beale was not receiving Singulair to treat his asthma, so he filed an action seeking a preliminary injunction in the United States District Court for the Western District of Pennsylvania. *See id.* at ¶ 184. Judge Baxter, a Senior Deputy Attorney General, and Nurse Ross, all agreed that Beale should receive Singulair. *See id.*

Despite this agreement, Beale could not get his monthly supply of Singulair at SCI-Chester when he went to get it on October 6, 2020. *See id.* at ¶ 185. He was told by a nurse that his prescription had run out, and it would have to be renewed by the doctor. *See id.* Beale was concerned because this identical situation is what caused him to seeking injunctive relief in the Western District. *See id.* at ¶ 186. He filed a grievance relating to the missing Singulair. *See id.*

---

[16] Beale asserts that this was not the first time he had problems with his diet card despite submitting sick-call slips for a renewed card. *See id.* at ECF p. 56. He claims that it would take him six to twelve weeks to get a new card, and he would have to go on hunger strikes just to get renewed card. *See id.*

The initial response to his grievance noted that, *inter alia*, his prescription had expired on September 7, 2020, but was renewed on October 9, 2020. *See id.* at ECF p. 48. The response also stated that his request for Singulair on a daily basis was approved. *See id.*

On May 13, 2021, Beale "had a problem getting a renewed Wixela inhaler because his previous [one] ran out." *Id.* at ¶ 191. Beale also did not get his Wixela inhaler on the morning of May 16, 2021. *See id.*[17]

On June 14, 2021, Beale submitted a sick-call slip so he could obtain a refill of his "maintenance inhaler." *Id.* at ¶ 193. When Beale went to obtain his inhaler on June 16, 2021, the nurse told him that she did not have one for him. *See id.* The nurse also told Beale that he needed to have the unit officer call Medical or go to Medical himself to get a new inhaler. *See id.* Beale asked the unit officer to call Medical, but the officer refused because "that was not his job." *Id.*

On August 26, 2021, Beale submitted a sick-call slip because he was having trouble breathing. *See id.* at ¶ 199. The following day, Beale was taken to Medical, where P.A. Nicholson treated him. *See id.* at ¶ 200. Beale explained his symptoms to P.A. Nicholson, and P.A. Nicholson checked Beale's lungs. *See id.* P.A. Nicholson noted that Beale "had a little wheezing." *Id.* Beale told P.A. Nicholson that he had experienced irregular breathing since his inhaler was changed from Dulera 200 to Wixela. *See id.* P.A. Nicholson told Beale that the Department of Corrections, and not WellPath, Inc., changed Beale's asthma pump. *See id.* P.A. Nicholson also stated that "the Chief of Clinical Services was the one who approves the change for financial purposes." *Id.*

---

[17] In the Amended Complaint, Beale quotes a portion of a response to a grievance he filed relating to not receiving his inhaler on May 13, 2021. *See id.* at ¶ 192. In the quoted response, it indicates that Beale told a nurse that he was doing away with the grievance because he received the inhaler on the same day he wrote the grievance. *See id.*

On September 16, 2021, Beale went to get a refill for his Wixela inhaler from a nurse. *See id.* at ¶ 201. The nurse told Beale that the Wixela was not "KOP" (keep on person). *See id.* Beale told the nurse that he has a response to a grievance stating that the Wixela was KOP. *See id.* at ¶¶ 196, 201. Beale submitted a grievance regarding the nurse's statement about the inhaler not being KOP, and he received a denial of this grievance which indicated, *inter alia*, to the extent he previously received information that the inhaler was KOP, it was an error. *See id.* at ¶ 202.

<u>First Amendment Violations – Retaliation for Article Written About How SCI-Chester Handled COVID-19 Pandemic</u>

From March through June 2020, Beale kept records on how SCI-Chester was handling the COVID-19 pandemic and what he heard from corrections officers. *See id.* at ¶ 213. After Beale's parents died in mid-October 2020, Beale wrote an article titled, "'Indiscretionary [sic] Act of the D.O.C.' due to the way SCI-Chester was handling the COVID-19 situation" (hereinafter referred to as the "Article"). *Id.* at ¶ 214; *see* Am. Compl. Exs. at ECF pp. 564–69 (containing Article). This article criticizes SCI-Chester's actions. *See* Am. Compl. Exs. at ECF pp. 564–69.

Beale was called to the security lieutenant's office on January 30, 2021. *See* Am. Compl. at ¶ 215. While there, Lt. Arais interviewed Beale and asked him about papers Beale held which contained "the times of Counts, Re-Counts and Cleared Counts on them." *Id.* In response, Beale told Lt. Arais that he had been keeping track of those Counts for several years, including when he was incarcerated at SCI-Albion. *See id.* He explained that his records kept while at SCI-Albion showed a pattern of misconduct by prison employees during his litigation in the Western District. *See id.* at ¶ 217. In particular, the records showed that on every occasion it was time for him to use the law library, there would be a drill. *See id.* Beale sent these records to Judge Baxter, who informed the Deputy Attorney General assigned to the case that SCI-Albion needed to stop this practice. *See id.* Apparently, the practice then stopped. *See id.*

After talking to Lt. Arais, Beale was escorted to his cell to retrieve any documents containing the records of the Counts on them, including 20 composition books. *See id.* at ¶ 216. It appears these documents were retrieved, and later that evening Beale was placed in the RHU for "Keeping Meticulous Records." *Id.* at ¶ 218. During the time he was in the RHU, Beale's cell was searched. *See id.*

Beale received a notice signed by Lt. Arais that he was under investigation for possibly violating facility rules, and he would be confined pending disposition of those charges. *See id.* at ¶ 219. Beale was still confined in the RHU when Pennsylvania State Senator John Kane, some union representatives, Deputy Jerald Aponte, and several corrections officers visited on February 9, 2021. *See id.* at ¶ 221. Although one of the corrections officers tried to get Senator Kane to come up to Beale's cell, Deputy Aponte would not let him do so. *See id.*

On February 11, 2021, Beale was escorted to see Lt. Arais. *See id.* at ¶ 223. Lt. Arais told Beale that he would be placed back into population soon because he was cleared after the investigation. *See id.* Lt. Arais told Beale that he could not tell him not to keep records because it was against the law. *See id.* Yet, Lt. Arais also told Beale that they would not be returning the papers or composition books taken from his cell unless ordered by the court. *See id.*

Later that same day, Beale was escorted to the office of Security Captain Lorie Eason, who was the head of SCI-Chester's security. *See id.* at ¶ 224. Captain Eason told Beale that he would be out of the RHU soon, and she did not know why Lt. Arais put him there in the first place. *See id.*

Beale was released from the RHU and returned to his cell on February 12, 2021. *See id.* at ¶ 225. Upon his return to his cell, Beale noticed that it was in disarray and he was missing legal material (related to this case), a small writing tablet, and other papers, including a copy of the

Article. *See id.* at ¶ 227. Although Beale received some of the missing items on April 9, 2021, he claimed that others were still missing. *See id.* at ECF pp. 70, 71, 72.

During the morning of March 2, 2021, Beale placed a Request to Staff form in his door. *See id.* at ¶ 235. There was a lockdown later that morning, and during the lockdown, Corrections Officer S.L. Brown ("C.O. Brown") took the form, and Beale watched her walk towards the mailbox. *See id.* Once the lockdown was over, Beale left his cell to go to work. *See id.* at ¶ 236. When Beale passed C.O. Brown, she sarcastically told Beale that he did not have to watch her to see if he was going to place the form in the mailbox. *See id.* at ¶¶ 236, 238.

On March 3, 2021, C.O. Brown informed Beale that he was being moved to a different cell on the same housing unit. *See id.* at ¶ 239. Beale believes he was moved "so he could not see anything from his cell window, including what was going on at the Officer's desk or see [C.O.] Brown on the phone 85% of her shift." *Id.*

On the same date, Beale did not receive everything he had ordered from the Commissary because he was still under Administrative Custody ("AC") status as he was when he was in the RHU. *See id.* at ¶ 240. This was the second time that Beale's Commissary order was restricted because of his AC status. *See id.* at ¶ 241. Beale had submitted a Request to Staff form to U.M. Bourne, but he never received a response. *See id.* Beale believes that U.M. Bourne did not change his AC status on purpose because she was included in the Article. *See id.* at ¶ 242.

Beale interacted with U.M. Bourne again on March 23, 2021, after she had called Beale's supervisor while Beale was working in the library and asked to have Beale stop by her office. *See id.* at ¶ 249. U.M. Bourne told Beale that he was "no longer a Z-Code," claiming that this

designation only lasted a year. *Id.*[18] Beale disagreed with this explanation, and he told her that he would see her in court. *See id.*

In response to the possible loss of the Z-Code, on March 24, 2021, Beale submitted (1) a Request to Staff to D.S. Wahl and U.M. Connor-Council on March 24, 2021; (2) a grievance; (3) a Request to Staff, which contained a copy of his settlement agreement from his WDPA litigation, to Deputy Aponte, U.M. Bourne, John Booth from Psychological Services; (4) a notification to the WDPA, Pennsylvania Senior Deputy Attorney General Scott Bradley, and the Pennsylvania Department of Corrections Central Office; and (5) another Request to Staff to Deputy Aponte in which Beale stated that he would be filing a claim for breach of the settlement agreement. *See id.* at ¶¶ 250–51. Beale later "submitted" a breach of the settlement agreement with the WDPA. *See id.* at ¶ 253.

U.M. Bourne called Beale to her office on March 25, 2021. *See id.* at ¶ 252. When Beale arrived, U.M. Bourne handed him the notice he sent her and said that she did not need to be informed. *See id.* Later, when Beale arrived at his housing unit, C.O. Brown told him that he was getting a "celly." *Id.* The following day, two inmates informed Beale that they were supposed to move into his cell. *See id.* at ¶ 254.

On March 29, 2021, Beale spoke to D.S. Wahl about the Z-Code situation. *See id.* at ¶ 256. Beale showed D.S. Wahl the settlement agreement, and he told Beale that he needed the "legal people" at the Central Office to explain Beale's status. *See id.* Beale asked how long this process would take, and D.S. Wahl stated that he could get an answer in 24 hours. *See id.* Beale explained

---

[18] It appears that a "Z-Code" is a housing classification that would allow Beale to not have a cellmate while at SCI-Chester. *See Horan v. Gross*, Civ. A. No. 22-CV-01166, 2024 WL 115798, at *2 (M.D. Pa. Jan. 10, 2024) (describing meaning of Plaintiff's Z-Code).

that he hoped for an answer soon because he believed U.M. Bourne would try to place someone else in his cell. *See id.*

Later that day, Beale received a Request to Staff response from D.S. Wahl relating to the Z-Code. *See id.* at ¶ 257. He wrote that he had read the portion of the settlement agreement Beale gave to him, and he did not see that Beale was entitled to a Z-Code forever. *See id.* The next day, D.S. Wahl told Beale that he had received confirmation from the Central Office's Legal Department that Beale's Z-Code was for only one year. *See id.* at ¶ 258.

On the morning of May 6, 2021, breakfast was brought to Beale's housing unit. *See id.* at ¶ 271. Beale was going to get a shower, so he wanted to grab his breakfast tray, bring it to his cell, dump the food into a container, and then return the tray. *See id.* C.O. Brown would not allow him to do this and told him that he had to either take a shower and miss breakfast or eat and miss his shower. *See id.*

The following morning, C.O. Brown would not let Beale get his breakfast tray because Beale was wearing a bathrobe. *See id.* at ¶ 272. Beale believes that C.O. Brown was doing everything possible to prevent him from eating. *See id.* Approximately two hours later, U.M. Bourne called Beale over and told him that she was moving him to a new cell because he was not following the rules. *See id.* at ¶ 273. Later that afternoon, Beale was moved to a cell in another housing unit. *See id.* Beale noticed that the inmate being moved out of this new cell had a cat. *See id.* at ¶ 274. Beale believes that U.M. Bourne and C.O. Brown manufactured a "negative situation" with him just so they could move the inmate with the cat into Beale's housing unit, which apparently had other cats. *See id.*

On June 22, 2021, Beale received a cellmate. *See id.* at ¶ 292. This cellmate was apparently unvaccinated, and D.S. Eason had previously stated that unvaccinated inmates would not be

housed with vaccinated inmates, like Beale. *See id.* at ¶¶ 280, 293. Beale filed a grievance about getting a cellmate, and his cellmate was removed from the cell on June 24, 2021. *See id.* at ¶ 294. The following day, Beale received a new cellmate, who was also unvaccinated. *See id.* at ¶ 295. Beale seemingly tried to not let this new cellmate into the cell, which caused "Sgt. Prossor" to threaten Beale that if he did not let him into the cell, Beale would be placed in the RHU. *See id.* Beale apparently allowed this new inmate into his cell. *See id.*

Beale's newest cellmate stayed with him until June 28, 2021, when he was replaced with a vaccinated inmate. *See id.* at ¶ 296. Despite being vaccinated, this inmate was known to possess drugs and was scheduled for a hearing after having a "hot urine." *Id.* Beale believes that this inmate was placed in his cell so "he . . . could get caugh-up [sic] in [the inmate's] bad actions." *Id.* The inmate ultimately ended up in the RHU on July 1, 2021. *See id.* at ¶ 299.

Beale received a new, vaccinated cellmate on July 18, 2021. *See id.* at ¶ 302. Two days later, Beale spoke to Dr. King of the psychology department about his Z-Code. *See id.* at ¶ 303. Dr. King told Beale that his Z-Code could not be taken away without a psychological evaluation. *See id.* Beale explained to Dr. King that his Z-Code was taken away without such an evaluation. *See id.*

On July 21, 2021, Beale attended a video conference before Judge Joy F. Conti of the WDPA. *See id.* at ¶ 306.[19] During the conference, Judge Conti asked Beale if he had a cellmate,

---

[19] Beale claims that he was not notified that there was a conference, and he told Judge Conti as such. *See id.* Beale also told the Judge that he was unprepared. *See id.* Judge Conti told Beale to have his unit manager let him know why he was not notified about the hearing and whether his Z-Code status was placed on the computer. *See id.* at ¶ 307. Judge Conti told Beale to let her know what the unit manager said in response. *See id.*

In accordance with Judge Conti's directive, Beale submitted a Request to Staff to U.M. Nealy. *See id.* Beale received a response to the request from her, but she did not answer why he was not notified about the hearing or provided with an update as to his cell status. *See id.*

and Beale told her that he did. *See id.* At that point, Judge Conti told the Deputy Attorney General that he needed to direct the Superintendent to remove the cellmate from Beale's cell immediately. *See id.* Beale's cellmate was later removed from his cell. *See id.*

Beale had a hearing with Judge Conti on July 27, 2021. *See id.* at ¶ 311. During the hearing, the Deputy Attorney General conceded that Beale needed to remain in a single cell and that the defendants would follow Judge Conti's Permanent Injunction Order. *See id.* The following day, Beale received a copy of Judge Conti's Memorandum Opinion and Permanent Injunction Order. *See id.* at ¶ 312.

On August 13, 2021, Senator Kane again visited SCI-Chester. *See id.* at ¶ 318. Beale "heard that the President of the Correctional Officer's Union wanted [Beale] . . . to talk to the Senator." *Id.* However, Beale was unable to talk to Senator Kane because SCI-Chester was placed on a lockdown while the Senator was there, and Senator Kane was never brought up to Beale's housing unit. *See id.*

On the same date, U.M. Bourne had submitted a "Move Sheet" to have another inmate placed in Beale's cell. *See id.* at ¶ 319. Despite this directive, C.O. T.L. Budd ("C.O. Budd") would not place this other inmate in Beale's cell and contacted U.M. Bourne. *See id.* C.O. Budd explained to U.M. Bourne that Beale had a Z-Code. *See id.* Nevertheless, U.M. Bourne gave C.O. Budd a "direct order" to place this other inmate in Beale's cell. *See id.* C.O. Budd then contacted the Shift Commander about the situation, and the Shift Commander told C.O. Budd that it was acceptable to place this other inmate in a different cell which had an open bunk. *See id.*

On August 21, 2021, breakfast was being served on the first floor of SCI-Chester because an elevator was broken and was awaiting repairs. *See id.* at ¶ 313.[20] Beale possessed an "elevator pass" and had no way of getting to his tray without exacerbating his asthma. *See id.* Beale then asked Unit Officer A. Brown whether anyone was going to the first floor to collect trays for inmates with elevator passes. *See id.* Another inmate overheard this conversation and told Officer Brown that Sgt. Quilter indicated that inmates were not allowed to bring up trays. *See id.* Officer Brown contacted Sgt. Quilter to confirm what the other inmate said, and Sgt. Quilter told Officer Brown that there was no "delivery service," and inmates needed to get their trays so long as they were not moved. *See id.*[21]

Beale submitted Request to Staff forms to G.C. Quinn on August 16, 25, and 30, 2021, but he never received any responses from her. *See id.* at ¶ 322. Beale claims that SCI-Chester "has a nack [sic] for taking parts of grievance(s) out when inmates send them to the Chief, Secretary's Office so the grievance [sic] can be dismissed." *Id.*

On November 1, 2021, Beale had a pass to go to the Law Library. *See id.* at ¶ 338. Unit Officer J. Norris told all inmates in the unit that Commissary was on its way, so she was not letting anyone out until Commissary was complete. *See id.* Beale told Unit Officer Norris that he had a deadline with this Court; yet she reaffirmed that he could not leave until Commissary was

---

[20] Beale's cell was located on the third floor. *See id.* at ¶ 324. There are eight flights of stairs to get to the first floor. *See id.*
    The Court notes that at one point in the Amended Complaint, Beale claims that he was the only inmate with an elevator pass not to be moved to the first floor as of August 28, 2021. *See id.* Yet, he also acknowledges that as of August 24, 2021, he was moved to the first floor. *See id.* at ¶ 329.
[21] Presumably, this reference to "moved" meant that certain inmates were moved to another floor due to the elevator not working.

completed. *See id.* Unit Officer Norris also told Beale that he could go ahead and sue her because she did not care and the State would pay for her anyway. *See id.*

On November 7, 2021, Beale submitted a Request to Staff to U.M. McCown concerning the issue he had with Unit Officer Norris. *See id.* at ¶ 341. The following day, Unit Officer Norris handed Beale a Request to Staff which was folded and stapled in such a way that allowed her to read it. *See id.* at ¶ 342. The response stated that Beale should see Unit Manager McCown during office hours. *See id.* Beale believes that this is not the proper procedure for returning Requests to Staff to the requester; instead, "[t]he Request is suppose [sic] to be stapled where no writing can be seen." *Id.* Due to the way the Unit Manager folded and stapled the Request, "le[ft] room for more retaliation." *Id.*

Beale points out that he filed numerous grievances due to the retaliation he experienced from his Article. *See id.* at ¶ 347; *see also id.* at ECF pp. 58–97 (identifying grievances, responses thereto, and appeals). He believes that D.S. Eason "was the one who orchestrated, coordinated, and had his subordinates do what happened to cause [him] to file" the grievances. *Id.* at ¶ 347. Beale also believes that Superintendent Eason "was made because [the Article] was sent to [Senator Kane] and there were repercussions behind [sic] it." *Id.*

<u>Eighth Amendment Violation Due to the Fire Alarm Continuously Blaring</u>

The fire alarm at SCI-Chester would go off and on at various times during the day since February 28, 2021. *See id.* at ¶ 348. On October 12, 2021, Beale was awakened several times due to the fire alarm going off. *See id.* Beale filed a grievance and Request to Staff relating to the fire alarm, and was essentially told that a fire alarm service contactor was working on repairing the system and there was a plan in place to upgrade it. *See id.* at ECF pp. 98–101.

<u>Fifth and Fourteenth Amendment Due Process Violations by Grievance Coordinator for
Noncompliance with DOC Policies</u>

Beale appears to assert that G.C. Quinn violated DOC policies in responding to his grievances in three ways.[22] First, G.C. Quinn responded to two of Beale's grievances by informing Beale that issues based on separate events must be presented in separate grievances, which was in Beale asserts that this is a violation of Policy DC-ADM 804, section 1.A.14, which stated, "Any grievance based on separate events must be presented separately, unless it is necessary to combind [sic] the issues to support the claim." *Id.* at ECF pp. 102, 103 (emphasis omitted). Second, G.C. Quinn violated DOC policy when she rejected his April 30, 2021 grievance regarding the missing documents from his cell on the ground that he failed to include supporting documentation. *See id.* at ECF p. 102. Beale appears to believe that because the missing paperwork was paperwork he created, it could not be included on the forms he could have completed to provide the required documentation. *See id.*[23] Finally, G.C. Quinn violated DOC policy when she responded to three of his grievances as part of the initial review. *See id.* at ECF pp. 103–04.

---

[22] The Court has construed the Amended Complaint as asserting three types of violations of DOC policies. Strangely, Beale also mentions an issue with his cable service; however, it is very much unclear how any policy violation occurred. *See id.* at ¶¶ 355–56.

    In this regard, Beale filed a grievance on September 25, 2020, due to certain cable channels being unavailable on the cable service. *See id.* at ¶ 355. Beale points out that there is a DOC policy which would allow him to receive a prorated refund for an interruption in cable service if a prorated refund was required under the agreement between the cable service provider and the DOC. *See id.* It appears that a prorated refund was appropriate for the loss of service insofar as G.C. Quinn responded to the grievance by stating Beale would receive a partial refund for $2.97 for the interruption in the cable service. *See id.* at ¶ 356. Because he obtained a partial refund, it is unclear how G.C. Quinn violated a DOC policy.

[23] As an aside, Beale believes that D.S. Eason ordered the Security Team to take Beale's items and not place them on the confiscation items receipts. *See* Am. Compl. at ECF p. 102. Beale points out that D.S. Eason "knew this Law Suit [sic] was against him and his subordinates. [The] Grievance Coordinator is also the Superintendent's secretary and if you put two and two together…… well you'll always get four." *Id.*

For relief, Beale seeks (1) compensatory and punitive damages, (2) a declaration that defendants violated his constitutional rights, and (3) "[a] permanent injunction ordering [Superintendent Lamas, D.S. Eason], and their subordinates not to retaliate against [him] or any person(s) involved in this action, whether by way of declaration or deposition [sic], or any course of involvement." *Id.* at ECF p. 115. Beale also seeks reimbursement of any costs and the filing fee. *See id.* at ECF pp. 115–16.

**B.**    **Responses to the Amended Complaint Through the Filing of Motions for Summary Judgment**

Dr. Little filed a Motion to Dismiss the Amended Complaint on January 26, 2022. *See* ECF No. 66. The SCI-Chester Defendants then filed a Motion to Dismiss the Amended Complaint on January 28, 2022. *See* ECF No. 68. Beale filed responses in opposition to the Motions on March 3, 2022, and March 14, 2022, respectively. *See* ECF Nos. 75–77. The SCI-Chester Defendants filed a Reply Brief in further support of their Motion to Dismiss on March 23, 2022. *See* ECF No. 78.

On September 15, 2022, Judge Smith entered an Order denying Dr. Little's Motion to Dismiss. *See* ECF No. 90. On the same date, Judge Smith entered a separate Order resolving the SCI-Chester Defendants' Motion to Dismiss. *See* ECF No. 91. In this second Order, Judge Smith, *inter alia*, dismissed with prejudice Beale's claims (1) for monetary damages against Defendants in their official capacities because of Eleventh Amendment immunity, (2) against Superintendent Lamas, U.M. McCown, G.C. Quinn, Defendant R. Govaeea, and Dr. Seid, for the failure to state a claim, and (3) for due process violations for G.C. Quinn's purported failure to follow DOC policies, for the failure to state a claim. *See* Sept. 15, 2022 Order at 2–3 & nn.1–2, ECF No. 91.

Dr. Little filed an Answer with Affirmative Defenses to the Amended Complaint on September 29, 2022. *See* ECF No. 96. The SCI-Chester Defendants filed an Answer with Affirmative Defenses to the Amended Complaint on October 13, 2022. *See* ECF No. 100.

On February 7, 2023, Beale filed another Motion for a Preliminary Injunction in which he sought to have SCI-Chester's librarians allow him sufficient time to be in the law library. *See* ECF No. 119. Judge Smith entered an order on February 10, 2023, denying the Motion because Beale had not named the librarians as defendants in this action. *See* ECF No. 123.

The SCI-Chester Defendants filed a Motion to Dismiss seeking to have all claims against U.M. Selby dismissed with prejudice on March 29, 2023.[24] *See* ECF No. 132. Judge Smith entered an Order granting this Motion and dismissing with prejudice all claims against U.M. Selby on April 13, 2023. *See* ECF No. 140. Beale filed an appeal from this Order, *see* ECF No. 144, which the Third Circuit Court of Appeals dismissed for lack of jurisdiction on October 5, 2023. *See* Docket, *Beale v. Little, et al.*, No. 23-1831 (3d Cir.).[25]

Defendants separately filed the instant Motions for Summary Judgment on June 15, 2023. *See* ECF Nos. 154, 157. The following day, Defendants jointly filed a Motion to have the Court stay all pretrial deadlines pending the resolution of the Motions for Summary Judgment. *See* ECF No. 158. On July 3, 2023, Beale filed a Motion to Extend the Discovery Deadline. *See* ECF No. 163. Judge Smith entered an Order on July 6, 2023, which, *inter alia*, (1) granted Defendants' Motion to stay all pretrial deadlines, (2) vacated all remaining deadlines in the operative scheduling

---

[24] As stated in the Motion, U.M. Selby had suffered a traumatic brain injury and neither he nor the individual acting as his power of attorney were able to participate in the case in a meaningful way. *See* Mem. of Law in Supp. of Commonwealth Defs.' Mot. to Dismiss Pl.'s Am. Compl. Against Michael Selby at ECF p. 5, ECF No. 132.

[25] This was not Beale's only appeal the Third Circuit dismissed for lack of jurisdiction. The Third Circuit also dismissed an appeal Beale filed from an Order from Judge Smith which denied his request that the Court examine the DOC's inmate mail policy. *See* ECF Nos. 130, 131, 136, 170.

order, (3) granted Beale's request to extend the discovery deadline so he could respond to the Motions for Summary Judgment, and (4) set a date for Beale to file his responses to the Motions for Summary Judgment. *See* July 6, 2023 Order at 2, ECF No. 166. Beale filed his Response in Opposition to the SCI-Chester Defendants' Motion for Summary Judgment on October 11, 2023. *See* ECF No. 179.[26]

This matter was reassigned from Judge Smith's calendar to the undersigned calendar on November 29, 2023, due to Judge Smith's untimely passing. *See* ECF No. 180. The Motions for Summary Judgment are ripe for disposition.

## II.    DISCUSSION

### A.    <u>Standard – Motions for Summary Judgment</u>

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020). And a fact is material if "it might affect the outcome of the suit under governing law." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party moving for summary judgment must "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

---

[26] Beale appears to have filed a pretrial statement along with his response. *See* ECF No. 178. There was also a cover letter in which Beale references having filed a response to Dr. Little's Motion for Summary Judgment. *See id.* at ECF p. 1 ("Enclosed, please find a copies [sic] of a Pretrial Statement, Plaintiff' [sic], Thomas Beale's Response to Satement [sic] of Facts Precluding The Entry of Summary Judgment, and Memorandum of Law In [sic] Opposition to Defendant's Motion for Summary Judgment for both the Commonwealth and Defendant Paul G. Little that were filed today."). Despite this reference, the Court thoroughly examined Beale's response to the SCI-Chester Defendants' Motion for Summary Judgment and could not locate a specific response to Dr. Little's Motion. *See generally* ECF No. 179.

which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the nonmoving party must then "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

In applying this standard, the court must "construe the evidence in the light most favorable to the non-moving party." *Anderson*, 477 U.S. at 255. At the summary judgment stage, the court's role is not to weigh the evidence and determine the ultimate truth of the allegations. *See Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019) ("At the summary judgment stage, [the court's] role is 'not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial[.]'" (quoting *Anderson*, 477 U.S. at 249)). Instead, the court's task is to determine whether there remains a genuine issue of fact for trial. *Id.*

### B.    Dr. Little's Motion for Summary Judgment

In Dr. Little's Motion, he argues that the Court should grant summary judgment in his favor on Beale's claims that Dr. Little violated the Eighth Amendment by being deliberately indifferent to his serious medical needs when there were delays in getting gloves for Beale's hands and renewals of his asthma medication. *See* Br. in Supp. of Mot. for Summ. J. at ECF p. 6, ECF No. 154. Dr. Little contends that the record shows that there is no genuine issue of material fact concerning whether he provided constitutionally appropriate medical care to Beale and was deliberately indifferent to his serious medical needs. *See id.* Dr. Little further contends that Beale has failed to exhaust his administrative remedies on these claims as required by the Prison

Litigation Reform Act, 42 U.S.C. § 1997e. *See id.*; *see also* Answer and Affirmative Defenses at 28, ECF No. 96 (asserting failure to exhaust administrative remedies as affirmative defense to Amended Complaint).

As indicated above, Beale unfortunately does not appear to have specifically responded to Dr. Little's Motion for Summary Judgment. Nevertheless, the Court cannot grant Dr. Little's Motion simply because it is unopposed. Instead, as to Dr. Little's contention that Beale failed to exhaust his administrative remedies, since Dr. Little bears the burden on that issue, the Court must "determine that the facts specified in or in connection with the motion entitle the moving party to judgment as a matter of law." *Anchorage Assocs. v. V.I. Bd. of Tax Rev.,* 922 F.2d 168, 175 (3d Cir. 1990). Regarding Dr. Little's contention that there are no genuine issues of material fact on Beale's Eighth Amendment deliberate indifference claims, since Dr. Little "does not have the burden of proof on the relevant issues," the Court "must determine that the deficiencies in the opponent's evidence designated in or in connection with the motion entitle the moving party to judgment as a matter of law." *Id.* (citing *Celotex Corp.*, 477 U.S. at 317).

The Court will first set forth the applicable factual record for purposes of resolving Dr. Little's Motion. Next, the Court will address whether Beale failed to exhaust his administrative remedies as to all or some of his claims against Dr. Little. Finally, the Court will address Beale's substantive claims.

### 1.      Applicable Factual Record

#### a.      Beale's Issues with His Hands/Ordering of Gloves

P.A. Nicholson first saw Beale concerning issues with his hands on March 19, 2019. *See* Dr. Little's Concise Statement of Material Facts in Supp. of Mot. for Summ. J. ("Dr. Little Facts")

at ¶ 16, ECF No. 154-2; *id.*, Ex. A at 246–47, ECF No. 154-3;[27] *see also* Am. Compl. at ¶ 69. Beale told P.A. Nicholson that he was experiencing bilateral hand pain and coldness, as well as an inability to fully extend the DIP[28] of his right "third finger." Dr. Little Facts at ¶ 16; Med. Recs. at 246. P.A. Nicholson examined Beale and noted that his hands were "cool bilaterally without erythema, cyanosis, or pallor," his "pulses [were] intact bilaterally in the upper extremities," and he was unable to actively extend the DIP of his right third finger. *See id.* For his assessment, P.A. Nicholson noted "Raynaulds? [sic]" and "R/O Mallet Finger Deformity." *Id.* He also ordered an x-ray of Beale's finger. *See* Dr. Little's Facts at ¶ 16; Med. Recs. at 246–47.

Beale's finger was x-rayed later that day. *See* Dr. Little's Facts at ¶ 17; Med. Recs. at 388. The x-ray showed that Beale had an avulsion fracture of the dorsal plate of the distal phalanx of the middle finger. *See* Dr. Little's Facts at ¶ 17; Med. Recs. at 388.[29] The following day, Dr. Little placed a request for Beale to receive a consultation about his fractured finger at the Hand Center. *See* Dr. Little's Facts at ¶ 18; Med. Recs. at 360.

On March 25, 2019, P.A. Nicholson saw Beale after he had submitted a sick call due to complaints of bilateral hand coldness and burning. *See* Dr. Little's Facts at ¶ 19; Med. Recs. at 244–45; *see also* Am. Compl. at ¶¶ 71–72. During this visit, Beale reported to P.A. Nicholson that

---

[27] Exhibit A to Dr. Little's Motion consists of Beale's medical records while at SCI-Chester. Hereinafter, the Court will cite to this exhibit as "Med. Recs."

[28] "DIP" refers to the distal interphalangeal joints, which are "the synovial joints between the middle and distal phalanges of the fingers . . . ." *Distal Interphalangeal Joints (DIP)*, Stedman's Medical Dictionary (2014).

[29] An avulsion fracture is

> a fracture that occurs when a joint capsule, ligament, or muscle insertion or origin is pulled from the bone as a result of a sprain, dislocation, or strong contracture of the muscle against resistance; as the soft tissue is pulled away from the bone, a fragment (or fragments) remains attached to the soft tissue of the bone.

*Avulsion Fracture*, Stedman's Medical Dictionary (2014).

he had some relief when wearing gloves. *See* Dr. Little's Facts at ¶ 19; Med. Recs. at 244. P.A. Nicholson examined Beale's hands and noted that they were "cool bilaterally without pallor, cyanosis, or erythema." *Id.* P.A. Nicholson's assessment indicated Raynaud's, and the plan was to start Beale on 2.5 mg of Norvasc.[30] Dr. Little's Facts at ¶ 19; Med. Recs. at 244.

P.A. Nicholson again saw Beale on April 3, 2019, after Beale had submitted a sick call due to pain and burning in his hands. *See* Dr. Little's Facts at ¶ 20; Med. Recs. at 242; *see also* Am. Compl. at ¶¶ 74–75. P.A. Nicholson examined Beale's hands and noted that the digits on both hands were cold. *See* Dr. Little's Facts at ¶ 20; Med. Recs. at 242. There was "[n]o erythema, pallor, or cyanosis." Dr. Little's Facts at ¶ 20; Med. Recs. at 242. The assessment and plan were to R/O (rule out)[31] Raynaud's and have Beale take 2.5 mg of Norvasc daily. Dr. Little's Facts at ¶ 20; Med. Recs. at 242.

Beale saw Matthew S. Wilson, MD of the Philadelphia Hand to Shoulder Center concerning his fractured finger on April 9, 2019. *See* Dr. Little's Facts at ¶ 21; Med. Recs. at 387; *see also* Med. Recs. at 385–86 (Dr. Wilson's letter to Dr. Little concerning Beale's follow-up visit following April 9, 2019 appointment); Am. Compl. at ¶ 80 (describing visit). Dr. Wilson noted that Beale's X-rays "demonstrated findings consistent with a bony mallet without evidence of subluxation." Med. Recs. at 385. Beale's finger was placed into a mallet finger splint, and he was directed to wear it full-time for eight weeks. *See id.*

---

[30] Norvasc (or amlodipine) "belongs to a class of drugs known as calcium channel blockers," which "works by relaxing blood vessels so blood can flow more easily." *Norvasc*, WebMD, https://www.webmd.com/drugs/2/drug-5942/norvasc-oral/details (last visited March 27, 2024).
[31] *See R/O*, Stedman's Medical Dictionary (2014).

On or about April 10, 2019, Beale submitted a grievance relating to his hands to G.C. Quinn. *See* Dr. Little's Facts, Ex. B ("Grievance Recs.") at 26, ECF No. 154-4; *see also* Am. Compl. at ¶ 81 (alleging filing of grievance). Beale's grievance stated:

> One March 25, 2019, I was diagnosed with Raynaud's Phenomenon, a disease of the hands from being in constant cold temperatures and tobacco smoke. Raynaud's is a non curing [sic] disease. I was diagnosed by PA Nicholson and prescribed Amlodpine [sic], a beta blocker which causes viens [sic] to dilate so the blood flow to my hands becomes normal. At times my hands hurt so bad, it brings me to tears. My fingers feel like they are being pulled off my hands. I filed grievance(s) #665994, 715003, 755256, 776106 and 791261 on both issues. The cell is still very cold and inmates still smoke on the Unit even when the Officers are notified.

Grievance Recs. at 26. Beale sought to receive "proper medical attention and [permission] to wear latex and regular gloves at all times." *Id.*

This grievance was initially rejected on April 12, 2019, because, *inter alia*, "[t]he issue(s) presented . . . has been reviewed or is currently being reviewed and addressed." *Id.* at 28; *see* Am. Compl. at ¶ 83. Beale received notice of the grievance rejection on April 15, 2019. *See* Grievance Recs. at 28, 29. Beale appealed from the rejection on April 16, 2019. *See id.* at 29. The denial of the grievance was upheld on April 30, 2019, because there was no medical documentation stating that he must wear gloves at all times." *Id.* at 29–31; Am. Compl. at ¶¶ 87–88.

On April 18, 2019, Dr. Benjamin Robinson examined Beale about his complaints of "persistent cold hands and fingers aggravated by environmental temperature" and "increasing numbness and pain associated with Raynaud's phenomenon." Dr. Little's Facts at ¶ 22; Med. Recs. at 229; *see also* Am. Compl. at ¶ 90 (describing visit with Dr. Robinson). Dr. Robinson continued Beale on his current medication and treatment plan, and he noted that consideration would be given

to alternative hand apparel such as thermal gloves. *See* Dr. Little's Facts at ¶ 22; Med. Recs. at 229.[32]

Dr. Little saw Beale on May 16, 2019, after Beale had submitted a sick call "for issues he attribute[d] to Raynaud's." Dr. Little's Facts at ¶ 23; Med. Recs. at 208–09. Dr. Little noted that Beale claimed the temperature in his cell was 35 degrees Fahrenheit "despite the warm spring weather," and he was complaining of bilateral pain in his hands. *See* Dr. Little's Facts at ¶ 23; Med. Recs. at 208. Dr. Little also examined Beale's hands and noted that his "[h]ands [were] warm to touch," "[c]apillary refill [was] normal," and he did not have edema. *See* Med. Recs. at 208. Dr. Little's assessment appeared to indicate a question regarding Raynaud's. *See id.*[33] His plan was to increase Beale's Amlodipine to 5 mg and add APAP (acetaminophen). *See id.* at 209; Dr. Little's Facts at ¶ 23. There was to be a follow-up in a month. *See* Dr. Little's Facts at ¶ 23; Med. Recs. at 209.

Beale had this follow-up visit with Dr. Little on July 1, 2019. *See* Dr. Little's Facts at ¶ 26; Med. Recs. at 202–04. Dr. Little noted that Beale "continue[d] to complain of episodes of numbness of his hands accompanied by discomfort and burning," and had "not seen much improvement on amlodipine." Dr. Little's Facts at ¶ 26; Med. Recs. at 202. Beale's extremities were examined, and Dr. Little observed that Beale's "bilateral hands are cool to the touch," his "capillary refill appears normal," his "radial pulses are symmetric bilaterally," and "Allen's test is negative bilaterally." Med. Recs. at 202.[34] Dr. Little's assessment was for possible Raynaud's

---

[32] The records attached to the Motion do not contain any evidence corroborating Beale's allegation that Dr. Robinson "would 'push' for [Beale] to get gloves," Laws-Smith would order gloves, or Beale offered to pay for gloves but was "turned down." Am. Compl. at ¶ 90.

[33] Beale alleged that Dr. Little said he would have gloves ordered for his Raynaud's. *See* Am. Compl. at ¶ 105. This allegation is not reflected in the medical records.

[34] An Allen test is

syndrome. *Id.* Dr. Little's plan was to have Beale continue amlodipine, he would order Gore-Tex gloves for Beale, and wanted to check "collagen vascular panel (rheumatoid factor, Antinuclear test, and sed rate)." *Id.* at 203; Dr. Little's Facts at ¶ 26.[35]

On July 19, 2019, Beale saw Dr. Wilson for a follow-up appointment on his finger. *See* Dr. Little's Facts at ¶ 29; Med. Recs. at 385–86. Dr. Wilson noted that Beale reported minimal pain and was pleased with his recovery. *See* Dr. Little's Facts at ¶ 29; Med. Recs. at 385. X-rays of Beale's finger "reveal[ed] a healed bony mallet fracture of the middle finger." Med. Recs. at 385. Although the fracture fragment remained visible, Dr. Wilson noted that "the joint remains congruent." *Id.* Dr. Wilson sent Beale to his therapist to be instructed on "phase-two of the mallet finger protocol," namely, "range of motion exercises," "wean[ing] . . . from the splint during the day, but hav[ing] him continue to wear the splint full-time at night." *Id.* at 385–86; Dr. Little's Facts at ¶ 29. Dr. Wilson planned to see Beale on an as needed basis. *See* Dr. Little's Facts at ¶ 29; Med. Recs. at 386.[36]

Beale saw P.A. Nicholson on August 26, 2019, concerning issues with his ankles and feet as well as coldness and paresthesia in his fingers. *See* Dr. Little's Facts at ¶ 34; Med. Recs. at 174–75. Regarding Beale's hands, P.A. Nicholson examined his hands and noted that they were "cool bilaterally" and did not have cyanosis, pallor, or edema. *See* Dr. Little's Facts at ¶ 34; Med. Recs.

---

a test for radial or ulnar patency; either the radial or ulnar artery is digitally compressed by the examiner after blood has been forced out of the hand by clenching it into a fist; failure of the blood to diffuse into the hand when opened indicates that the noncompressed artery is occluded.

*Allen Test*, Stedman's Medical Dictionary (2014).

[35] On July 5, 2019, Beale had blood work performed in the nature of an Antinuclear antibody test (ANA AB) as requested by Dr. Little. *See* Dr. Little's Facts at ¶ 27; Med. Recs. at 199, 203.

[36] It appears Dr. Robinson reviewed Dr. Wilson's report on Beale's follow-up examination. *See* Dr. Little's Facts at ¶ 30; Med. Recs. at 194–95.

at 174. P.A. Nicholson also noted that "glovers [sic] [were] ordered through mckesson [sic]." Med. Recs. at 174.[37] The plan was to start Beale on new medication. *See id.* at 175; Dr. Little's Facts at ¶ 34.

Beale received gloves on October 2, 2019. *See* Dr. Little's Facts at ¶ 39; Med. Recs. at 164–65.[38] On October 22, 2019, Dr. Little saw Beale in a follow-up relating to different medical issues. *See* Dr. Little's Facts at ¶ 43; Med. Recs. at 149–50. Dr. Little noted that Beale was complaining of only foot and ankle discomfort and pointed out that "his Reynaud [sic] . . . seems to be improved as well." Dr. Little's Facts at ¶ 43; Med. Recs. at 149.

On June 22, 2020, Beale presented to Medical for replacement gloves because he said his were worn. *See* Dr. Little's Facts at ¶ 63; Med. Recs. at 93. On August 5, 2020, Dr. Little saw Beale after Beale had submitted a sick call slip due to multiple issues, as well as a request for new gloves. *See* Dr. Little's Facts at ¶ 64; Med. Recs. at 88–90. Regarding the gloves, Beale reported to Dr. Little that his gloves had "melted," and he asked for a new pair. *See* Dr. Little's Facts at ¶ 64; Med. Recs. at 88. Dr. Little indicated that he would "try to get new gloves from HSA." Dr. Little's Facts at ¶ 64; Med. Recs. at 89.[39]

---

[37] In the Amended Complaint, Beale alleged that P.A. Nicholson checked the computer to see if gloves were ordered, and he could not locate a record of an order for gloves. *See* Am. Compl. at ¶ 109. There is nothing in the records attached to Dr. Little's Motion to support this allegation.

[38] In the Amended Complaint, Beale alleged that he had been asked by different nurses on September 19 and 22, 2021 whether he had received the gloves. *See* Am. Compl. at ¶¶ 110–11. He also alleged that he saw Dr. Little on September 23, 2019, regarding the results of blood work. *See id.* at ¶ 112. Beale alleged that he asked Dr. Little why his gloves were not ordered, and Dr. Little told Beale "the process took a long time." *Id.* There are no documents attached to the Motion supporting these allegations.

In addition, Beale characterized the gloves he received as "Garden Gloves." *Id.* at ¶ 114; *see also id.* at ¶ 121. The records attached to the Motion do not reflect the type of gloves Beale received. Beale noted that Dr. Little gave him a "Med-Card" so he could wear the gloves at all times. *See id.* at ¶ 115.

[39] Dr. Little states that "HSA" refers to the health services administrator. *See* Dr. Little's Facts at ¶ 64.

Beale went to Medical on December 28, 2020, where P.A. Nicholson noted that Beale was seeking the gloves he had ordered. *See* Dr. Little's Facts at ¶ 70; Med. Recs. at 485; *see also* Am. Compl. at ¶¶ 122–23. On January 15, 2021, Beale submitted a grievance relating to the gloves to G.C. Quinn. *See* Am. Compl. Exs. at ECF p. 4. Beale's grievance stated:

> On Dec [sic] 28, 2020, I was seen [sic] by P.A. Nicholson about gloves for my Raynauds [sic]. I've been suffering due to not having them. The attacks of Raynauds [sic] have become worst [sic]. They come more rapid at longer lengths. Sometimes they last 30 minutes. It's very painful. Some cause me to cry. The gloves on the commissary do not work even if I double them up.

*Id.* For relief, Beale sought "the proper type of gloves for Raynaud's. Whatever the District Court deems necessary." *Id.* As for any "actions taken and staff [he had] contacted, before submitting [the] grievance," Beale indicated that he spoke to P.A. Nicholson "on a couple occasions" but "[n]o action [was] taken." *Id.*

Nurse Ross responded to this grievance on February 23, 2021. *See id.* at ECF p. 5. She upheld the grievance, explaining that she "met with [him] on 2/21/21 regarding this issue," "mentioned that [she would] follow up with the MD and/or the PA regarding gloves specifically designed for your condition," and would "request the purchase of these gloves." *Id.*

Beale went to medical on May 17, 2021, to see if his gloves had been ordered. *See* Dr. Little's Facts at ¶ 76; Med. Recs. at 36. Beale received new gloves on May 19, 2021. *See* Dr. Little's Facts at ¶ 77; Med. Recs. at 34–35; *see also* Am. Compl. at ¶ 19.[40]

Beale saw Dr. Little on November 5, 2021, because Beale was seeking a new pair of gloves. *See* Dr. Little's Facts at ¶ 86; Med. Recs. at 480. Dr. Little indicated that Beale's gloves were

---

[40] While ultimately unrelated to the claims at issue here because these events occurred after the filing of the Amended Complaint, Dr. Little points out that on May 31, 2022, P.A. Nicholson saw Beale, and Beale was issued a new set of large gloves. *See* Dr. Little's Facts at ¶ 94; Med. Recs. at 445. Beale also returned his gloves for a replacement on August 30, 2022, and he received a new pair that day. *See* Dr. Little's Facts at ¶ 96; Med. Recs. at 490–93.

"visibly worn with fingers exposed," and the gloves were last issued in April. Med. Recs. at 480. Dr. Little also noted that he discussed with HSA Minnis to order additional pairs of gloves. *See id.*

b.   Beale's Asthma Medication

Dr. Little saw Beale for pulmonary care on April 24, 2018. *See* Dr. Little's Facts at ¶ 6; Med. Recs. at 320–24. Dr. Little's notes from that visit indicate that, *inter alia*, Beale (1) had asthma which was triggered by cigarette smoke, (2) experienced asthma symptoms such as wheezing, shortness of breath, and coughing, throughout the day, (3) used his rescue inhaler several times per day, (4) experienced exertional dyspnea and dyspnea at rest, (5) reported that "fluticasone/salmeterol" was "causing worsening [sic] shortness of breath[]," and (6) was using less than one SABA canister per month and had one asthma attack during the past month. Dr. Little's Facts at ¶ 6; Med. Recs. at 320–21, 323. Dr. Little assessed Beale has having asthma, and he indicated that Beale's asthma was "[m]ild persistent." Dr. Little's Facts at ¶ 6; Med. Recs. at 323. Beale's medications were renewed, and Dr. Little indicated that he would try to get Dulera reapproved. *See* Dr. Little's Facts at ¶ 6; Med. Recs. at 324. Dr. Little scheduled another visit with Beale in six months. *See* Med. Recs. at 324.

On October 25, 2018, Dr. Little saw Beale regarding his pulmonary issues. *See id.* at 275–79; Dr. Little's Facts at ¶ 7. Dr. Little noted that Beale had asthma which was triggered by the change in seasons. *See* Dr. Little's Facts at ¶ 7; Med. Recs. at 275. He also noted that Beale reported experiencing asthma symptoms and using his SABA rescue inhaler less than two days per week. *See* Dr. Little's Facts at ¶ 7; Med. Recs. at 275. Beale was not experiencing any symptoms or medication side effects. *See* Dr. Little's Facts at ¶ 7; Med. Recs. at 276. Dr. Little indicated that Beale's asthma control was good insofar as he used less than one SABA canister per month and had no asthma attacks over the past month. *See* Dr. Little's Facts at ¶ 7; Med. Recs. at 278.

Although Dr. Little still classified Beale's asthma as "[m]ild persistent," he noted that his asthma status was "[i]mproved – Less severe diagnosis." Med. Recs. at 278. Dr. Little renewed Beale's medications and ordered Beale to return to him in six months. *See id.* at 278–79; Dr. Little's Facts at ¶ 7.

Beale went to Medical on May 30, 2019, where he saw P.A. Nicholson. *See* Dr. Little's Facts at ¶ 25; Med. Recs. at 206–07. During this visit, Beale indicated that he was there to see if his Singulair was available because he was told on the prior day that it was pending approval. *See* Dr. Little's Facts at ¶ 25; Med. Recs. at 206. P.A. Nicholson informed Beale that Singulair would be available to him for pickup that night. *See* Dr. Little's Facts at ¶ 25; Med. Recs. at 206.

Dr. Little again saw Beale for pulmonary care on August 12, 2019. *See* Dr. Little's Facts at ¶ 32; Med. Recs. at 179–84. Dr. Little noted that Beale had asthma which was triggered by "seasonal allergies." Dr. Little's Facts at ¶ 32; Med. Recs. at 179. He also noted that Beale still reported experiencing asthma symptoms and using his SABA rescue inhaler less than two days per week. *See* Dr. Little's Facts at ¶ 32; Med. Recs. at 179. Beale was not experiencing any symptoms or medication side effects. *See* Dr. Little's Facts at ¶ 32; Med. Recs. at 180. Dr. Little indicated that Beale's asthma control was good insofar as he used less than one SABA canister per month and had no asthma attacks over the past month. *See* Dr. Little's Facts at ¶ 32; Med. Recs. at 180. Dr. Little modified Beale's asthma classification from "[m]ild persistent" to "[i]ntermittent." Dr. Little's Facts at ¶ 32; Med. Recs. at 183. He also noted that Beale's asthma status was "[u]nchanged – Same diagnosis." Med. Recs. at 183. Dr. Little increased Beale's Amlodipine prescription to 10 mg, ordered Beale to return the pulmonary clinic in six months, and ordered Beale to be seen at the "MD/DO/PA/CRNP line" in six weeks. *See id.* at 183–84; Dr. Little's Facts at ¶ 32.

Beale saw Dr. Little on January 22, 2020, for complaints of "nonproductive cough, as well as shortness of breath on exertion." Dr. Little's Facts at ¶ 59; Med. Recs. at 100. Beale reported that he could "only walk about 100 to 200 feet on a flat level surface [before] becoming short winded." Med. Recs. at 100. Beale denied having any fever or chills, and he indicated that his symptoms had been ongoing for approximately ten days. *See id.*; Dr. Little's Facts at ¶ 59. Dr. Little examined Beale's lungs and noted that he had "[e]xpiratory wheezes bilaterally." Med. Recs. at 100. Beale was assessed as having an "[e]xacerbation of chronic asthma." *Id.* To address this issue, Dr. Little prescribed Beale Prednisone for seven days and directed that Beale continue his present bronchodilators. *See* Dr. Little's Facts at ¶ 59; Med. Recs. at 101. Beale was also directed to follow up in the physician line in three days. *See* Dr. Little's Facts at ¶ 59; Med. Recs. at 101.

On May 16, 2021, Beale submitted a grievance relating to his Wixela inhaler. *See* Am. Compl. Exs. at ECF p. 72. Beale's grievance stated as follows:

> On 5-13-21, I placed another "Sick-Call" slip, in front of the Nurse, who had her name tag turned backwards, trying to get another Wixela inhaler because it ran out. Today, appx [sic] 8:30 [a.m.], the medication cart arrived on BB Unit. I asked Nurse Skinner did they put an inhaler on the cart for me. She stated, "You're going to have to have the Officer call so it can be placed on the cart." I told he [sic] I put a Sick-Call slip in on 5-13-21. []She stated, "The inmates do the Sick-Call slips, we don't do those." I've run out of inhaler and have been asking the Nurses since I placed the first Sick-Call slip in on 5-10-21, but no one seems to care if I live or die.
>
> Relief: To have my inhaler(s) on time and whatever the Courts deem necessary.

*Id.* Beale indicated that he spoke to Nurses Skinner, Henderson, S. Davis, Young, and an unnamed "African female" about this issue. *Id.*

Beale received a response denying the grievance on May 21, 2021. *See id.* at ECF p. 73. Nurse Ross appears to have been the responding party, but her response indicates that she incorporated a response from "Ms. Minnis [from] WellPath HSA." *Id.* Ms. Minnis's indicated:

43

Mr. Beale states he put in a sick call request, which cannot be confirmed or denied being as though he was never put on the list to be seen. Nurses was educated to follow up with concerns once bought to their attention. I saw Mr. Beale today (5/19/21) and he said to do away with the grievance because he actually received the inhaler the same day he wrote the grievance. I explained to him I still had to respond. This grievance is resolved and denied.

*Id.* It does not appear that Beale filed an appeal from this denial.

On June 16, 2021, Beale submitted a grievance to G.C. Quinn. *See* Am. Compl. Exs. at ECF p. 81; *see also* Am. Compl. at ¶ 193. Beale's grievance stated:

On June 14, 2021, I submitted a 'Sick-Call' slip to Medical for a re-fill of my inhaler. One June 16, 2021, Medication was called on EB Unit. I joined the Med Line. Once at the window, I presented my ID Card and told the Nurse what cell I was in. I told her I was there for a refill of my maintenance inhaler. The Nurse looked in the draw [sic], but could not find the inhaler I receive. She then told me I had to have the Officer call Medical or go to Medical to receive a new inhaler. I asked the Officer and he informed me that that was not his job, that's Medical's job. I agree. I have been having problems getting a refill inhaler and this is the third grievance I've submitted about this situation. This is preposterous. I shouldn't have to go through this everytime [sic] I need a refill of my inhaler.

Am. Compl. Exs. at ECF p. 81. For relief, Beale asked "[t]o receive my refill inhaler after I submit a 'Sick-Call' slip like everybody else in the General Population and whenever the Court deem [sic] necessary." *Id.*

Beale received a response upholding in part and denying in part the grievance from "K. Favaloro" dated June 22, 2021. *See id.* at ECF p. 82. This response stated:

Per the Medical record, the inhaler was submitted for a refill on June 13, 2021. The order was filled on June 14, 2021. This medication is marked KOP on your medication profile. KOP medications are not stored on the cart, so the Nurse would not have had it during medication pass. These medications are passed out on second shift. This is the Medical Departments [sic] job to complete.

Grievance partially upheld. Your inhaler was filled immediately, however, it was not delivered in a timely manner. Medical does not determine what a Court deems necessary.

*Id.*

Beale appealed from this response on June 28, 2021. *See id.* at ECF pp. 83–84. In his

appeal, Beale stated:

> No one I asked knew that KOPs were served on second shift, because we always got our KOP during the first shift. Since this is a Medical fault, I believe this grievance should have been upheld to the fullest. There is nothing in this grievance response that stated there was nothing at fault that did not start with Medical. Everything I grieved, Ms. Favaloro agreed. This is the third time I had to greive [sic] Medical for my inhaler being given in a timely manner. A maintenance inhaler is very important with a person with a respiratory restriction. It could cause further damage or a person could die even though he has a rescue inhaler. The maintenance part of the treatment is very importatn [sic] and should be treated as so. These are Medical Professionals.

*Id.* at ECF p. 83. For relief, Beale sought to "have [his] inhaler refilled after [he] submit[s] a 'Sick-

Call' slip as DC-ADM 820 states." *Id.* at 84.

On July 12, 2021, Beale received a response to his appeal from D.S. Eason. *See id.* at ECF

p. 85. D.S. Eason denied the appeal, explaining as follows:

> In your appeal, you stated you believe your grievance should be upheld to the fullest. The determination by Medical was Upheld in Part/Denied in Part. Your initial grievance on this issue stated you submitted a sick call slip – which cannot be confirmed or denied as to whether you actually did so. Upon further investigation, it is documented by the CHCA that you met with her on 5/19/2021. During that meeting, you reportedly informed the CHCA that you wish to do away with this grievance #927776. You reasoning was because you received the inhaler on the same day that you wrote your grievance. You were informed by the CHCA that she was obligated to answer the grievance. The nurses are now administering medications at the Pharmacy windows at this time. The Medical department also has the right to alter administration of medication times when the need arises for operational purposes. It is also documented in Sapphire that you have your KOP inhalers on your person. Since this medication is KOP and not administered to you by the nursing staff. It is recommended by Medical that you alert the staff when you need another refill in a timely manner – allowing for ordering and delivering to this institution.

*Id.*

On August 17, 2021, Nurse Shani Clark ("Nurse Clark") reported that Beale complained

of shortness of breath. *See* Dr. Little's Facts at ¶ 81; Med. Recs. at 16–20. Beale told Nurse Clark

that his inhaler had been switched and his new inhaler was ineffective. *See* Dr. Little's Facts at ¶ 81; Med. Recs. at 16. He also said he could not breathe. *See* Dr. Little's Facts at ¶ 81; Med. Recs. at 16, 17. Nurse Clark noted that Beale was wheezing at his lung bases. *See* Dr. Little's Facts at ¶ 81; Med. Recs. at 17. Nurse Clark indicated that she spoke with Dr. Little, who prescribed 30 mg of Prednisone. *See* Dr. Little's Facts at ¶ 81; Med. Recs. at 17–18. Beale was instructed to put in a sick call slip. *See* Dr. Little's Facts at ¶ 81; Med. Recs. at 18.

The following day, Beale saw Dr. Little about his complaints of a "cough productive of yellowish secretions, wheezing[, and] chest tightness." Dr. Little's Facts at ¶ 82; Med. Recs. at 14. Dr. Little noted that Beale was seen the prior day as an emergency and had been prescribed Prednisone. *See* Dr. Little's Facts at ¶ 82; Med. Recs. at 14. He also noted that Beale's lungs were "[c]lear without rales, rhonchi, wheezing or diminished breath sounds." Med. Recs. at 14. Dr. Little assessed Beale as having an exacerbation of asthma. *See id.* at 15; Dr. Little's Facts at ¶ 82. Dr. Little's plan appeared to contemplate the prescribing of new medication. *See* Dr. Little's Facts at ¶ 82; Med. Recs. at 15.

On August 27, 2021, P.A. Nicholson saw Beale for a sick call to address his complaints that his asthma symptoms were getting worse because his current medication was ineffective. *See* Dr. Little's Facts at ¶ 84; Med. Recs. at 3. Beale requested to be placed on Dulera. *See* Dr. Little's Facts at ¶ 84; Med. Recs. at 3. P.A. Nicholson noted that he advised Beale that Dulera "is a non formulary [sic] medication, and he has been given an equivalent medication, wixela [sic]." Med. Recs. at 3. P.A. Nicholson examined Beale's lungs and found them to be CTA (presumably, "clear to auscultation") with no "rales, wheezes or rhonchi." *Id.* P.A. Nicholson's assessment was that Beale had asthma, and his plan was to, *inter alia*, discuss Beale's complaint with the medical director and have Beale continue with his current medications. *See* Med. Recs. at 4.

46

On November 15, 2021, Beale presented at Medical and saw P.A. Nicholson. *See* Dr. Little's Facts at ¶ 87; Med. Recs. at 479. Beale sought to renew his inhaler. *See* Dr. Little's Facts at ¶ 87; Med. Recs. at 479.

### 2.     Failure to Exhaust Administrative Remedies

#### a.     <u>Applicable Law on Exhaustion of Administrative Remedies Generally</u>

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The phrase "with respect to prison conditions" refers to "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). This includes a claim relating to the denial of medical care. *See, e.g.*, *Wallace v. Doe*, 512 F. App'x 141, 143–44 (3d Cir. 2013) (per curiam) (affirming district court's grant of summary judgment to defendants on plaintiff's section 1983 claim for deliberate indifference to his serious medical needs because he failed to exhaust the claim).

Exhaustion under the PLRA is mandatory. *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)). Section 1997e(a)'s mandatory exhaustion requirement promotes numerous and significant public policies, including:

> (1) avoiding premature interruption of the administrative process and giving the agency a chance to discover and correct its own errors; (2) conserving scarce judicial resources, since the complaining party may be successful in vindicating his rights in the administrative process and the courts may never have to intervene; and (3) improving the efficacy of the administrative process.

*Nyhuis v. Reno*, 204 F.3d 65, 75 (3d Cir. 2000). Moreover,

a comprehensive exhaustion requirement better serves the policy of granting an agency the opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court.  Moreover, even if the complaining prisoner seeks only money damages, the prisoner may be successful in having the [prison] halt the infringing practice or fashion some other remedy, such as returning personal property, reforming personal property policies, firing an abusive prison guard, or creating a better screening process for hiring such guards.  And when a prisoner obtains some measure of affirmative relief, he may elect not to pursue his claim for damages.  In either case, local actors are given the chance to address local problems, and at the very least, the time frame for the prisoner's damages is frozen or the isolated acts of abuse are prevented from recurring.

An across-the-board exhaustion requirement also promotes judicial efficiency. . . . A prisoner may use the threat of money damages as a bargaining chip to obtain relief that he really wants, and may then be satisfied when he gets that relief from the prison.  Moreover, even if only a small percentage of cases settle, the federal courts are saved the time normally spent hearing such actions and multiple appeals thereto.

In cases in which inmate-plaintiffs exhaust their remedies in the administrative process and continue to pursue their claims in federal court, there is still much to be gained.  The administrative process can serve to create a record for subsequent proceedings, it can be used to help focus and clarify poorly pled or confusing claims, and it forces the prison to justify or explain its internal procedures.  All of these functions help courts navigate the sea of prisoner litigation in a manner that affords a fair hearing to all claims.

Finally, applying § 1997e(a) without exception promotes the efficacy of the administrative process itself, which in our view can be a meaningful and constructive procedure.  Operating at its best, which it admittedly sometimes does not, a prison administrative grievance procedure will afford an inmate with a sense of respect.  If prison officials treat his claims with seriousness and care, they may well discover that he can be easily satisfied. . . . And if the inmate sees his meritorious claims handled with care by his jailers, he is more likely to respect their rules and serve his time in a manner that is as productive as possible.

*Id.* at 76–77 (internal citations, quotation marks, and footnote omitted).

There is no "futility" exception to the PLRA's administrative exhaustion requirement.  *Id.* at 71. Thus, prisoners "must . . . exhaust administrative remedies even where the relief sought—monetary damages—cannot be granted by the administrative process." *Woodford*, 548 U.S. at 85 (citing *Booth*, 532 U.S. at 734).

In addition, "the PLRA exhaustion requirement requires proper exhaustion." *Id.* at 83. Requiring proper exhaustion "eliminate[s] unwarranted federal-court interference with the administration of prisons, and thus seeks to 'affor[d] corrections officers time and opportunity to address complaints internally before allowing the initiation of a federal case.'" *Id.* at 93 (quoting *Porter*, 534 U.S. at 525). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90–91 (footnote omitted). If a prisoner does not properly exhaust his or her administrative remedies, the prisoner cannot file a lawsuit challenging prison conditions in federal court because he or she is procedurally defaulted from doing so. *Spruill v. Gillis*, 372 F.3d 218, 227–29 (3d Cir. 2004); *see Small v. Camden Cnty.*, 728 F.3d 265, 269 (3d Cir. 2013) ("Under the PLRA, exhaustion is a precondition for bringing suit under § 1983.").

A prisoner cannot properly exhaust administrative remedies "by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Woodford*, 548 U.S. at 83. The prisoner also "may not satisfy the exhaustion requirement after the filing of his complaint." *Wallace v. Miller*, 544 F. App'x 40, 42 (3d Cir. 2013) (citing *Ahmed v. Dragovich*, 297 F.3d 201, 209 & n.9 (3d Cir. 2002) and *Johnson v. Jones*, 340 F.3d 624, 627–28 (8th Cir. 2003)).

"An inmate . . . must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, 578 U.S. 632, 642 (2016). Thus, "an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* (quoting *Booth*, 532 U.S. at 738). Administrative procedures are unavailable if they (1) "operate[] as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) are "so opaque that it becomes, practically speaking,

incapable of use," such as when "no ordinary prisoner can discern or navigate it"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643–44; *see also Brown v. Croak*, 312 F.3d 109, 112–13 (3d Cir. 2002) (explaining that "[s]ection 1997e(a) only requires that prisoners exhaust such administrative remedies as are available" and, therefore, if the prisoner-plaintiff was correct that prison officials told him that he needed to wait until the termination of an investigation before he could file a formal claim yet never told him that they had completed the investigation, "the formal grievance proceeding . . . was never available to" the plaintiff (internal quotation marks omitted)).

The "exhaustion of administrative remedies under the PLRA is a question of law to be determined by the judge." *Drippe v. Tobelinski*, 604 F.3d 778, 782 (3d Cir. 2010) (agreeing with *Pavey v. Convey*, 544 F.3d 739, 740 (7th Cir. 2008)). The court must resolve this issue "even if that determination requires the resolution of disputed facts." *Small*, 728 F.3d at 269 (citing *Drippe*, 604 F.3d at 781). Also, as Dr. Little is asserting the affirmative defense of failure to exhaust administrative remedies, he bears the burden of proving that Beale failed to exhaust his administrative remedies. *See Brown*, 312 F.3d at 111 ("Failure to exhaust administrative remedies is an affirmative defense that must be pled and proven by the defendant.").

b.   Analysis

Beale asserts that Dr. Little violated the Eighth Amendment insofar as Dr. Little was deliberately indifferent to his serious medical needs when there was a delay in providing Beale with gloves and renewing his asthma medication. *See* Am. Compl. at ECF pp. 9, 22, 27, 28, 29, 113. These general claims can be broken into several discrete claims relating to (1) the delay in providing Beale his first pair of gloves, (2) the type of gloves Beale received, (3) replacing the gloves once the original gloves had worn out, (4) Beale's inability to obtain his daily dose of

Singulair on October 6, 2019, (5) switching Beale's maintenance inhaler from Dulera 200 to Wixela in April 2021, (6) Beale's inability to obtain his renewed Wixela inhaler on May 13, 2021, and (7) Beale's inability to obtain his renewed Wixela inhaler on June 16, 2021. As explained more below, at best, Beale exhausted only the latter two discrete claims, and even if he did, he procedurally defaulted on any claim against Dr. Little by failing to name him in those grievances.

i.  *The Initial Delay in Obtaining Gloves*

The record shows that Beale is not a stranger to the grievance process; rather, he is a prolific filer of grievances and is well aware of the process for filing and appealing from the disposition of those grievances. Dr. Little submitted copies of 21 grievances which Beale appealed to their final review under the DOC grievance process. *See* ECF No. 154-4. Moreover, the allegations in the Amended Complaint show that Beale filed numerous additional grievances and at least initially appealed from denials of those grievances in whole or in part. He even appealed from a grievance which was granted in his favor. Furthermore, Beale appears to believe that he knows the DOC's grievance process so well that he attempted to assert claims against G.C. Quinn for her alleged failure to properly follow this process. At bottom, the Court is satisfied that Beale was well versed in the DOC's grievance process and that this process was wholly available to him at all times relevant to the allegations in the Amended Complaint.[41]

---

[41] Concerning the DOC's grievance procedure:

> DC-ADM 804 provides a general, though rigorous, mechanism for inmate grievances. An inmate's submission of a written grievance is reviewed and results in an Initial Review Response or Rejection explaining the disposition of the inmate's grievance. Upon receipt of either response, an inmate has fifteen days to file an appeal with the Facility Manager. DC-ADM 804, § 2.A. Upon the Facility Manager's resolution of that appeal, the inmate may file for Final Review by the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). DC-ADM 804, § 2.B.

Despite Beale's extensive knowledge of the DOC's grievance process, the grievance records supplied by Dr. Little, the allegations in the Amended Complaint, and the exhibits Beale attached to the Amended Complaint, show that Beale never submitted a grievance about a delay in obtaining gloves despite what he alleges to be a constitutionally unreasonable delay in obtaining them. Beale alleges that Dr. Little first told him he would order gloves to assist with Beale's Raynaud's symptoms during a medical visit on May 16, 2019. *See* Am. Compl. at ¶ 104. Once again, there is no evidence in the record to support that this conversation occurred. Instead, the only record evidence is that Dr. Little told Beale he would order gloves for him during a follow-up visit on July 1, 2019. *See* Dr. Little's Facts at ¶ 26; Med. Recs. at 202–04. Then, almost two months later, Beale allegedly told P.A. Nicholson during a medical visit that he had not yet received the gloves, and P.A. Nicholson allegedly told Beale that the gloves had not yet been ordered but he would check with Dr. Little about the gloves. *See* Am. Compl. at ¶ 109. Beale even saw Dr. Little again on September 23, 2019, during which time Dr. Little allegedly told him that the process for obtaining the gloves "took a long time." *Id.* at ¶ 112.

Even though Beale alleges that Dr. Little told him he would order gloves in mid-May 2019, and he allegedly learned from P.A. Nicholson on August 26, 2019, that no gloves were ordered, he never filed a grievance regarding not having received the ordered (or unordered) gloves.[42]

---

*Moore v. Lamas*, No. 22-1007, 2023 WL 371397, at *2 (3d Cir. Jan. 24, 2023) (internal footnote omitted); *see also* Commonwealth of Pennsylvania Department of Corrections, Policy Statement: Inmate Grievance System – DC-ADM 804 (effective as of May 1, 2015), *available at*: https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/804%20Inmate%20Grievances.pdf.

[42] Beale did, however, submit a grievance in which he sought to receive proper medical attention for his hands and wear latex gloves under regular gloves bought at the Commissary. *See* Grievance Recs. at 26–34; Am. Compl. at ¶ 81. This grievance was initially rejected in part because "[t]he issue(s) presented . . . has been reviewed or is currently being reviewed and addressed." Grievance Recs. at 28; Am. Compl. at ¶ 83. Beale appealed from the rejection, and the relief he sought was

52

Accordingly, Beale failed to exhaust his administrative remedies regarding any delay in him obtaining gloves.

### ii.    *The Type of Gloves Beale Received*

Concerning the type of gloves Beale received on October 2, 2019, i.e., "garden gloves" versus thermal gloves, there are no allegations in the Amended Complaint, or evidence in the record, showing that Beale ever filed a grievance concerning the type of gloves he actually received as opposed to those he desired. Therefore, Beale failed to exhaust his administrative remedies regarding the type of gloves he received.

### iii.    *Replacements for His Worn Gloves*

The record introduced by Dr. Little shows that Beale first started seeking replacement gloves in June 2020, when he was at Medical. Beale did not request new gloves from Dr. Little

---

denied because there was "no medical documentation stating that he must wear gloves at all times." Grievance Recs. at 29–31; Am. Compl. at ¶¶ 87–88.

Even though this grievance involved Beale requesting gloves, it was not a grievance relating to gloves being ordered and not delivered. Moreover, the grievance did not name or reference Dr. Little. Therefore, to the extent that this grievance preserved any deliberate indifference claim by Beale, it is procedurally defaulted as to Dr. Little. *See Spruill*, 372 F.3d at 234 (explaining that DOC's policy relating to grievances, DC-ADM 804, provided that the grieving inmate "should identify any persons who may have information that could be helpful in resolving the grievance," which "put[s] the prison officials on notice of the persons claimed to be guilty of wrongdoing"; therefore, inmate plaintiff's claim can be procedurally defaulted if individual alleged of wrongdoing is not named in grievance and default is not otherwise excused); *Vo v. Wetzel*, No. 22-1210, 2022 WL 1467978, at *1 (3d Cir. May 10, 2022) ("Where a specific defendant is not identified by name [in a grievance], a prison may excuse the issue 'by identifying the unidentified persons and acknowledging that they were fairly within the compass of the prisoner's grievance.'" (quoting *Spruill*, 372 F.3d at 234)). This default is not excused because Dr. Little's name is not mentioned in either the response to the grievance or Beale's appeal. *See id.*; *see also* Grievance Recs. at 29–31.

The Court also notes that after Beale filed the aforementioned grievance, he saw Dr. Robinson, who allegedly told him that he would "push" to get gloves for him, and Laws-Smith would be ordering the gloves. *See* Am. Compl. at ¶ 89. While there is no evidence of these conversations actually occurring in the evidence of record, there is also no evidence of Beale ever filing a grievance against Dr. Robinson or Laws-Smith regarding the gloves.

until Beale saw Dr. Little on August 5, 2020. Beale later saw P.A. Nicholson on December 28, 2020, where he again asked for new gloves because his had worn out. When he did not receive new gloves, Beale filed a grievance on January 15, 2021, and Nurse Ross upheld the grievance on February 23, 2021. Presuming that this grievance preserves Beale's claim regarding a delay in obtaining replacement gloves, it is procedurally defaulted as to Dr. Little because he is neither mentioned in the grievance nor Nurse Ross's response to the grievance.[43]

iv.    *Beale's Inability to Obtain Singulair on October 6, 2020*

Beale alleges that he filed a grievance after he was unable to obtain his daily dose of Singulair and was told it would have to be reordered on October 6, 2020. *See* Am. Compl. at ¶ 187. He also alleged that he attached it as an exhibit to his Amended Complaint. *See id.* Unfortunately, the exhibits Beale submitted along with his Amended Complaint cover 584 pages and, while they are somewhat organized, the Court could not locate the grievance (No. 892983 or Exhibit GR-9) Beale references or any response thereto. Nevertheless, it would appear that such a grievance existed because in the Amended Complaint Beale quotes (purportedly) verbatim from the response he received to the grievance (which upheld the grievance to have Singulair on a daily basis), he avers that he appealed from the response because he did not agree with a portion of it that did not relate to his receipt of Singulair, and he states that the initial response was upheld on appeal. *See id.* at ¶¶ 188–90. If such a grievance existed, it would appear that Beale fully exhausted it. Also, while the text of the grievance itself is currently unknown insofar as it is not referenced

---

[43] While Nurse Ross's response to the grievance indicates that she will follow up with the "MD and/or the PA" regarding gloves specifically designed for Beale's condition, there is nothing in the record to show that she meant Dr. Little when she said "MD," especially considering Dr. Robinson was also involved in medical care at SCI-Chester. Therefore, any default for failing to name Dr. Little would not be excused. *But see Spruill*, 372 F.3d at 234–35 (finding prison's grievance system excused plaintiff's default for failing to name defendant in grievance where grievance officer's initial review response identified defendant by name).

54

in the Amended Complaint, Beale asserts that Dr. Little's name was included in the response to the grievance, which seemingly would have excused any procedural default by Beale not naming him in the original grievance. Therefore, the Court will presume this claim was fully exhausted.

       v.      *The Switching of Beale's Inhaler from Dulera to Wixela*

There is no evidence in the record showing that Beale filed a grievance regarding the switch of his maintenance inhaler from Dulera to Wixela. While Beale complained about its efficacy, he did not file a grievance concerning it. Therefore, he failed to exhaust his administrative remedies concerning this claim.

      vi.      *Beale's Inability to Obtain a New Wixela Inhaler in May 2021*

Beale submitted a grievance concerning his inability to obtain a Wixela inhaler in May 2021. Beale does not appear to have appealed from the denial of the grievance. Therefore, this claim is not fully exhausted. Moreover, even if he had fully exhausted it, any claim is procedurally defaulted against Dr. Little because there is no reference to him in either the grievance or the response.

      vii.      *Beale's Inability to Obtain a New Wixela Inhaler on June 16, 2021*

Beale fully exhausted his claim concerning his inability to obtain a new Wixela inhaler on June 16, 2021, despite having submitted a sick-call slip for a refill of the inhaler two days earlier. Nevertheless, this claim is procedurally defaulted against Dr. Little because his name is not mentioned in the grievance, the response to the grievance, the appeal, or the response to the appeal.

      viii.      *Conclusion*

As indicated above, Beale did not fully exhaust his deliberate indifference claims against Dr. Little for (1) a delay in initially obtaining gloves, (2) the type of gloves Beale initially received,

(3) the switch of Beale's maintenance inhaler from Dulera to Wixela, and (4) Beale's inability to obtain a new Wixela inhaler in May 2021. To the extent that Beale fully exhausted his deliberate indifference claims concerning obtaining new gloves due to his gloves becoming worn out and his inability to obtain a new Wixela inhaler on June 16, 2021, he has procedurally defaulted on those claims by failing to name Dr. Little in the grievance. These defaults are not excused because Dr. Little's name also did not come up in the responses to the grievance. Finally, Beale does appear to have fully grieved and preserved his deliberate indifference claim concerning not getting his dose of Singulair on October 6, 2020; however, the Court must again point out that the grievance he seems to have filed and any other documentation produced as the grievance made its way through SCI-Chester does not appear to be in the current factual record.

Although the Court will grant Dr. Little summary judgment as to Beale's unexhausted or defaulted claims identified above, the Court will nevertheless fully analyze the substance of his two general deliberate indifference claims—one relating to the gloves; the other relating to the asthma medication—for sake of completeness.

### 3.    Deliberate Indifference Claims Concerning the Gloves

To demonstrate a constitutional claim based on the failure to provide medical treatment, a prisoner such as Beale must show prison officials were deliberately indifferent to the prisoner's serious medical needs.[44] *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994). A prison official is

---

[44] Although Beale's claim is analyzed under the Eighth Amendment due to his status as a convicted inmate, the standard would be the same even if the Court analyzed this cause of action under the Fourteenth Amendment as it would if Beale was a pretrial detainee. *See Goode v. Giorla*, 643 F. App'x 127, 129 (3d Cir. 2016) (per curiam) ("A deliberate indifference claim, under either the Fourteenth or Eighth Amendment, requires acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." (footnote and internal quotation marks omitted)); *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (evaluating pretrial detainee's "Fourteenth Amendment claim for inadequate medical care under the standard used to evaluate similar claims brought under the Eighth Amendment"); *see also Moore v. Luffey*, 767 F.

not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotation marks omitted). A plaintiff can establish deliberate indifference "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999); *see also Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (explaining that plaintiff can show deliberate indifference where prison official "intentionally den[ied] or delay[ed] access to medical care or intentionally interfer[ed] with the treatment once prescribed" (internal citations and quotation marks omitted)). A serious medical need exists where "failure to treat can be expected to lead to substantial and unnecessary suffering." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991). Allegations and proof of medical malpractice and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation. *Spruill*, 372 F.3d at 235.

The evidence attached to Dr. Little's Motion shows that he is entitled to summary judgment on Beale's deliberate indifference claim concerning the gloves, including any delay in initially

---

App'x 335, 340 & n.2 (3d Cir. 2019) (evaluating deliberate indifference to serious medical needs claim by pretrial detainee under Eighth Amendment standard, declining to address whether new standard applies to these types of claims by pretrial detainees, and discussing similarity of standards under Eighth and Fourteenth Amendments).

receiving the gloves, the type of gloves he received, and any delay when he sought replacement gloves.[45] At Beale's first visit with Dr. Little regarding the pain in his hands on May 16, 2019, Dr. Little prescribed medication and scheduled a follow-up visit. Dr. Little had this follow-up visit with Beale on July 1, 2019, during which he indicated a plan to continue Beale on his previously prescribed medication, order Gore-Tex gloves for him, and have Beale submit to certain blood work. Beale submitted to the blood work.

Undoubtedly, Beale did not receive gloves until approximately three months after Dr. Little stated that he was ordering them. Nevertheless, there is no evidence in the record showing that Dr. Little did not order gloves for Beale, delayed in ordering gloves, or somehow delayed Beale's receipt of the gloves.[46] The evidence also does not show that Dr. Little stopped Beale's medication for the pain in his hands or ignored Beale's complaints about his hands. At bottom, there is no evidence showing that Dr. Little knew about Beale's need for medical treatment for his hands but intentionally refused to provide it by getting him gloves, delayed "necessary" medical treatment for Beale's hands by not getting him gloves for a non-medical reason, or prevented Beale from receiving needed or recommended medical treatment in the nature of gloves for his hands.

---

[45] The Court recognizes that there may be an issue as to whether Raynaud's is a serious medical need for purposes of a deliberate indifference claim, *see* Br. in Supp. of Mot. for Summ. J. at 19–21, ECF No. 154 (discussing dispute in out-of-circuit case law as to whether Raynaud's constitutes a serious medical need), especially considering it is unclear with which type of Raynaud's Beale was diagnosed. Nevertheless, in addressing Dr. Little's Motion, the Court presumes that Beale's Raynaud's is a serious medical need because it appears that, at some point in the medical records, Dr. Little believed Beale had Raynaud's. Beale also complained of pain and burning in his hands.
[46] To the extent that Beale would rely on his allegation that he saw P.A. Nicholson on August 26, 2019, and P.A. Nicholson told him that computer records showed that gloves had not yet been ordered, this allegation is based on hearsay and conflicts with the medical records showing gloves were ordered. Moreover, if gloves had not been ordered, Beale would not have received them on October 2, 2019.

In addition, the evidence shows that Dr. Little was not deliberately indifferent once Beale received gloves on October 2, 2019. Although Beale asserts in his Amended Complaint that the gloves he received were "garden gloves" and not thermal gloves, he never alleges in the Amended Complaint that he complained to Dr. Little about those gloves or that they did not keep his hands warm. To the contrary, the only evidence in the record on this Motion shows that three weeks after receiving the gloves, Dr. Little noted that Beale's Raynaud's appeared to be improving.

As for when Beale sought replacement gloves, the record shows that Dr. Little first learned that Beale was seeking replacement gloves on August 5, 2020. Dr. Little indicated that he would try to get Beale new gloves from the NSA. While Beale did not get new gloves until May 19, 2021, there is no evidence in the record that Dr. Little intentionally did not attempt to get Beale new gloves (during the midst of the COVID-19 pandemic), delayed attempting to get him new gloves, or prevented Beale from getting new gloves. There is also no indication that Dr. Little knew that Beale did not get new gloves until May 19, 2021.

Overall, while there was some delay in Beale first obtaining gloves and then obtaining new gloves, the Court has to consider the evidence presented in Dr. Little's Motion to examine what **he** either did or did not do. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable.).[47] This evidence simply does not show that Dr. Little intentionally denied Beale care for

---

[47] To the extent that Beale is possibly bringing his claim against Dr. Little under a theory of *respondeat superior*, he cannot prevail under that theory in a section 1983 claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (explaining that "[b]ecause vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"); *see also Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015) ("Although a court can infer that a defendant had contemporaneous knowledge of wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive." (citations omitted)).

his hands, delayed getting gloves for his hands, or prevented Beale from getting gloves initially or new gloves when his gloves wore down. Accordingly, even if Beale preserved any deliberate indifference claim against Dr. Little pertaining to the gloves, Dr. Little would still be entitled to summary judgment on this claim.

### 4. Deliberate Difference Claim Regarding Beale's Asthma Medication

The evidence attached to Dr. Little's Motion also demonstrates that he is entitled to judgment as a matter of law on Beale's deliberate indifference claim relating to his asthma medication.[48] As illustrated by the Court's recitation of the relevant allegations in the Amended Complaint, Beale's deliberate indifference claim against Dr. Little appears to be based on three events: (1) his inability to get Singulair on October 6, 2020 because the prescription had "run out" and needed to be reapproved by "the doctor"; (2) the switching of his maintenance inhaler from Dulera 200 to Wixela in April 2021; and (3) his issues with getting a "renewed" Wixela inhaler in May and June 2021. *See* Am. Compl. at ¶¶ 185–86, 191–93.

Regarding the first event on October 6, 2020, there are no documents attached to the Motion providing any evidence as to what transpired on that date or soon thereafter. As such, it

---

Additionally, to the extent that Beale was attempting to assert a claim against Dr. Little as a supervisor, it would not change the resolution of this claim. Beale alleges that Dr. Little "oversees the care of the inmate population and oversees the physician's assistant [sic] that work under him." Presuming there was evidence to support this allegation, Beale would have to establish that Dr. Little either (1) "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm[;]" or (2) "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (citation omitted); *see Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014) (explaining requirements for supervisory liability in section 1983 claim, and describing "two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates"), *rev'd on other grounds sub nom. Taylor v. Barkes*, 575 U.S. 822 (2015). There is no such evidence in this record to establish supervisory liability under either theory.

[48] The Court will presume, without deciding, that Beale's asthma presented a serious medical need.

would appear that Dr. Little is entitled to judgment as a matter of law as to this alleged event of deliberate indifference. Nevertheless, as explained above, Beale alleged that he filed a grievance in which he sought to have Singulair on a daily basis and attached this grievance to the Amended Complaint. *See* Am. Compl. at ¶ 187. Beale also purports to quote from Nurse Ross's response to the grievance. *See id.* at ¶ 188.

Presuming that Nurse Ross's response to the grievance matched Beale's allegation in the Amended Complaint, Beale's claim of deliberate indifference would still fail. Beale's claim equates to an unknown, but seemingly limited period, of not having his daily dose of Singulair, insofar as Nurse Ross's response to the grievance indicated that Dr. Little had reviewed Beale's Singulair prescription and reordered it on October 9, 2020, for a period of six months.[49] *See* Am. Compl. at ¶ 188. Thus, it appears that upon receipt of information that Beale's prescription had expired, Dr. Little promptly reviewed it and reordered Singulair for Beale. By no means does this demonstrate deliberate indifference by Dr. Little. There is no evidence that Dr. Little knew that Beale's Singulair prescription expired prior to him reordering Singulair or that Dr. Little knew that a delay in Beale receiving Singulair presented "a substantial risk of serious harm" to Beale.[50] *Farmer*, 511 U.S. at 842.

---

[49] It is appropriate at this point, even though it is ultimately irrelevant to the Court's resolution of Beale's claims, to note that despite Beale's repeated assertions that Judge Baxter ordered that he be prescribed Singulair as part of the Western District action, Beale has never identified an Order from Judge Baxter stating as such. Again, even if there was such an Order, it has no bearing on the resolution of this claim.

[50] Beale alleged in the Amended Complaint that upon learning that his Singulair prescription expired, he was concerned about receiving "the same treatment [he received] on April 15, 2014, when he was told his Singulair had 'run out' and would have to be re-approved by the doctor." Am. Compl. at ¶ 186. He also alleges that "[d]elays in [his receipt] of Singulair causes him not to breathe properly." *Id.* at ¶ 187. Despite these allegations, there is no evidence that he received "the same treatment" or that he experienced any breathing issues, much less any that required medical care, due to the lack of Singulair in early October 2019. *See, e.g.*, *Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003) ("[I]n most cases, the actual medical consequences that flow from the

Concerning the switching of Beale's maintenance inhaler from Dulera 200 to Wixela (purportedly) in April 2021, there is no evidence of deliberate indifference by Dr. Little.[51] Beale's claim amounts to his personal disagreement as to the efficacy of Wixela versus Dulera 200 and such a disagreement is insufficient to show deliberate indifference on behalf of Dr. Little.[52] *See Spruill*, 372 F.3d at 235 (explaining that "'[m]ere disagreement as to the proper medical treatment' is also insufficient [to establish a constitutional violation]" (quoting *Lanzaro* 834 F.2d at 346)). Additionally, "where, as here, medical care was provided, courts 'presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care.'" *Washington v. Barnhart*, No. 21-2180, 2023 WL 5607513, at *2 (3d Cir. Aug. 30, 2023) (per curiam) (quoting *Pearson*, 850 F.3d at 534). There is no evidence in the record showing that Dr. Little's treatment concerning the Wixela inhaler, to the extent that Dr. Little even was the individual who prescribed

---

alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm."); *Bilal v. White*, 494 F. App'x 143, 145–46 (2d Cir. 2012) ("Even assuming that Bilal's conditions could produce serious complications if neglected over sufficient time, there is no evidence that Bilal's conditions worsened over the hours of delay here[.]" (internal citation omitted)); *cf. Flowers v. Mullet*, No. CIV-16-30-C, 2016 WL 3960910, at *6 (W.D. Okla. June 27, 2016) (finding that plaintiff's allegations of suffering sinus damage, headaches, and difficulty breathing at night were insufficient evidence to create disputed material issue for trial because those "vague allegations of symptoms do not evidence substantial harm resulting from the approximately four week delay in providing Plaintiff with his prescribed allergy and asthma medications"), *report and recommendation adopted*, 2016 WL 3963208 (W.D. Okla. July 21, 2016).

[51] It is very much unclear whether Dr. Little was even the individual who switched Beale from Dulera 200 to Wixela. Beale alleged that P.A. Nicholson informed him that the DOC, and not WellPath, Inc. (which presumably employed Dr. Little), changed Beale's inhaler. *See* Am. Compl. at ¶ 200.

[52] According to the medical records attached to Dr. Little's Motion, Beale complained about the efficacy of Wixela and indicated a desire to be placed on Dulera 200 on one occasion, August 27, 2021. *See* Dr. Little's Facts at ¶ 84; Med. Recs. at 3–4. On this date, P.A. Nicholson examined Beale regarding his complaint that his asthma symptoms were worsening and the Wixela was ineffective. *See* Dr. Little's Facts at ¶ 84; Med. Recs. at 3. P.A. Nicholson informed Beale that Wixela was an equivalent medication to Dulera 200, and he noted that Beale's lungs were CTA (presumably, "clear to auscultation") with no "rales, wheezes or rhonchi." Med. Recs. at 3.

this inhaler for Beale, "amounted to 'a substantial departure from accepted professional judgment.'" *Id.* (quoting *Pearson*, 850 F.3d at 539)).

As for the final event, Beale's alleged delays in getting his Wixela inhaler on May 13, 2021, and June 14, 2021, there is also no evidence showing deliberate indifference on behalf of Dr. Little. Once again, there are no documents attached to Dr. Little's Motion relating to these events. Yet, even if the Court were to presume that Beale supported his factual allegations in the Amended Complaint with evidence, there is no viable claim for deliberate indifference against Dr. Little.

Per Beale's recitation of a grievance he seemingly filed when he could not get his Wixela inhaler on May 13, 2021, it appears that Beale acknowledged to Nurse Ross that he received his inhaler on the same day he wrote the grievance.[53] *See* Am. Compl. at ¶ 192. As for his inability to get an inhaler on June 14, 2021, this appears to have nothing to do with Dr. Little as Beale received a grievance response indicating that an order was submitted for a refill of his inhaler on June 13, 2021, and it was filled on June 14, 2021. *See id.* at ¶ 194. Simply because the inhaler was not on the cart (as it appears there was an issue as to whether Beale was supposed to keep this inhaler with him), does not mean that Dr. Little was somehow deliberately indifferent to his serious medical needs. To the contrary, it appears that Dr. Little (or someone else from Medical) ensured that Beale's Wixela inhaler prescription was in effect and filled. Therefore, Dr. Little is entitled to judgment as a matter of law on Beale's deliberate indifference claim as to his asthma medication as well.[54]

---

[53] It does not appear that Beale appealed from the denial of this grievance.

[54] In the "Legal Claims" portion of the Amended Complaint, Beale states that

> [a]ll of the acts committed by [Dr. Little] were done to punish [him] for filing Complaint(s)/Grievance(s), which was a substantial or motivating factor, with

**C.      The SCI-Chester Defendants' Motion for Summary Judgment**

In the SCI-Chester Defendants' Motion, they contend that they are entitled to judgment as a matter of law as to all claims asserted against them in the Amended Complaint. *See* Mem. of Law in Supp. of Commonwealth Defs.' Mot. for Summ. J. ("Defs.' Br.") at 7–8, ECF No. 157. They assert that Beale fails to name any of them as defendants in his claims concerning meals, asthma medication, and fire alarm testing. *See id.* at 8. They further assert that Beale's other claims "do not rise to the level of constitutional violations." *Id.* Lastly, they contend that some of Beale's claims fail because he failed to exhaust his administrative remedies. *See id.* at 22–25. The Court will first analyze the exhaustion issue before addressing the SCI-Chester Defendants' other arguments in support of their Motion.

**1.      Failure to Exhaust Administrative Remedies**

The SCI-Chester Defendants argue that Beale failed to exhaust certain claims. *See id.* Specifically, they contend that Beale failed to (1) timely file a grievance relating to his complaints of ETS which named C.Os. Goode-Williams, Lyons, DeVane, Karasinski, or Winstead; (2) timely file a grievance relating to his complaints of cold temperatures which named C.O. Lees, D.S. Eason, or U.M. Connor-Council; and (3) appeal a grievance pertaining to Nurse Ross, beyond the Facility Manager. *See id.* at 25 (citing Defs. Statement of Undisputed Material Facts in Supp. of

---

intentional[,] reckless, callous indifference to [his] serious medical need, that led to defendant's inadequate medical treatment, causing [him] to suffer prolonged excruciating pain, which is cruel and unusual punishment, in violation of the **EIGHTH AMENDMENT** to the United States Constitution.

Am. Compl. at ¶ 407. Although this statement constitutes a legal conclusion, the current record does not provide any support that Dr. Little somehow retaliated against Beale because he filed any complaints or grievances.

Mot. for Summ. J. ("Defs.' SOF") at ¶¶ 10, 13, 18, 22, 26, 30, 41, 43, 49, 55, ECF No. 156). Each of these contentions will be addressed in turn.

a.    Beale's ETS Claims Against C.Os. Goode-Williams, Lyons, DeVane, Karasinski, and Winstead

The SCI-Chester Defendants contend that Beale has failed to produce any evidence that he timely filed a grievance relating to any of his complaints about ETS which named C.Os. Goode-Williams, Lyons, DeVane, Karasinski, or Winstead. *See id.* at 25 (citing Defs.' SOF at ¶¶ 10, 13, 18, 22, 26, 30). In response, Beale argues that he did not need to name all defendants in grievances to properly exhaust his claims, *see* Pl.'s Resp. to Commonwealth Defs.' Statement of Material Facts and Counter-Statements of Material Facts Precluding the Entry of Summ. J. (Pl.'s Br.") at ECF p. 100, ECF No. 179 (citing *Byrd v. Shannon*, 715 F.3d 117, 127 (3d Cir. 2013)). He also points out that he named C.Os. Goode-Williams and Lyons in a grievance. *See id.*

Concerning Beale's belief that he did not need to name defendants in a grievance to preserve a section 1983 claim against those defendants, he is mistaken. In support of his argument, he references a phrase from *Byrd* where the Third Circuit Court of Appeals indicated that the PLRA did "not have a 'name all defendants' requirement." *Id.*; *Byrd*, 715 F.3d at 127. While his quotation is accurate, Beale ignores the Third Circuit's text following that phrase:

> The PLRA itself does not have a "name all defendants" requirement. *Jones v. Bock*, 549 U.S. 199, 217, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). However, prisoners are required to complete the administrative review process in accordance with rules that are defined by the prison grievance process. *Id.* at 218, 127 S.Ct. 910. The relevant provision of the prison grievance system at the time that Byrd filed his grievance in 2008 was DC–ADM 804, Part VI.A.7, which stated, in pertinent part: "The inmate will identify any person(s) who may have information that could be helpful in resolving the grievance."[55]

---

[55] The policies of the Pennsylvania Inmate Grievance System were amended in 2010. The provision requiring inmates to identify individuals can now be found at DC–ADM 804, § 1.A.11, which states, in pertinent part: "The inmate shall identify individuals directly involved in the event(s)."

*Byrd*, 715 F.3d at 127 (footnote in original). The Third Circuit then went on to conclude that the district court properly granted summary judgment for the defendant because (1) Byrd did not name this defendant in his grievance and (2) "there [was] no indication that prison administrators were aware that [the defendant] was allegedly involved with the events surrounding the grievance before Byrd filed suit." *Id.*

Here, Beale does not identify any grievance about ETS in which he named C.Os. DeVane, Karasinski, or Winstead. As such, he has either failed to exhaust or has procedurally defaulted on any Eighth Amendment claim relating to exposure to ETS against them.

As for C.Os. Goode-Williams and Lyons, Beale accurately points out that he included their names in a grievance (No. 791261).[56] *See* Pl.'s Br. at ECF p. 100; Am. Compl. Exs. at ECF p. 180. However, Beale's use of Goode-Williams' name does not match the factual allegation against him in the Amended Complaint. Beale alleged that Goode-Williams was deliberately indifferent on March 27, 2019, when he allegedly caught another inmate smoking, did not report the inmate, and suggested that the inmate smoke when it was not his shift. *See* Am. Compl. at ¶ 31. Beale's grievance stated that he informed Goode-Williams about the unit smelling of tobacco smoke on March 8, 2019, only to have Goode-Williams fail to take any action in response to Beale's complaint. *See* ECF No. 180. Therefore, Beale's ETS claim against Goode-Williams is unexhausted as well.

Beale's claim against C.O. Lyons is a different story. His allegations in the Amended Complaint against C.O. Lyons appear to correlate with those in this grievance. *Compare* Am. Compl. at ¶¶ 24–26, *with* Am. Compl. Exs. at ECF p. 180. In addition, it appears that Beale fully

---

[56] In his submission, Beale identifies the grievance as both Nos. 791261 and 791262. *See* Pl.'s Br. at ECF p. 100. It appears that the latter reference is in error.

exhausted this particular grievance. *See* Am. Compl. Exs. at ECF pp. 180–89. Thus, unlike C.Os. Goode-Williams, Karasinski, DeVane, and Winstead, C.O. Lyons is not entitled to summary judgment on Beale's Eighth Amendment ETS claim against him.

        b.    <u>Beale's Cold Temperature Claims Against D.S. Eason, U.M. Connor-Council, and C.O. Lees</u>

The SCI-Chester Defendants argue that Beale has failed to produce any evidence that he timely filed a grievance concerning complaints of cold temperatures which related to D.S. Eason, U.M. Connor-Council, or C.O. Lees. *See* Defs.' Br. at 26. Beale responds to this argument by incorrectly claiming again that he did not need to name these defendants in a grievance to fully exhaust his claims against them and by pointing out that he named D.S. Eason and U.M. Connor-Council in a grievance pertaining to cold temperatures (No. 776106). *See* Pl.'s Br. at ECF p. 101. Beale does not state anything in his response about a specific grievance referencing C.O. Lees. *See id.*

As there is no evidence that Beale filed a grievance relating to C.O. Lees and cold temperatures at SCI-Chester, Beale failed to exhaust his administrative remedies concerning this claim.[57] Regarding D.S. Eason and U.M. Connor-Council, Beale has not provided any evidence in support of his assertion that he named both of them in grievance No. 776106. It does not appear to be among the exhibits he attached to his Amended Complaint, and he did not attach it to his response to the SCI-Chester Defendants' Motion. Yet, the SCI-Chester Defendants acknowledge that this grievance exists. *See* Defs.' SOF, Ex. 2 at ECF p. 2, ECF No. 156-2 (identifying grievance

---

[57] Beale's only factual allegations connecting C.O. Lees and his complaints about the cold temperatures relate to an October 7, 2019 incident when C.Os. Lees and Rodriguez made Beale stand outside of his cell and handcuffed him. *See* Am. Compl. at ¶¶ 117–20. Beale does not allege that he filed a grievance relating to this incident and the Court could not locate such a grievance in the summary judgment record.

No. 776106). Furthermore, this grievance and the documents created as it made its way through the administrative review process are attached as an exhibit to Dr. Little's Motion. *See* Grievance Recs. at 14–22. As such, the Court will consider this grievance and other documentation in analyzing the SCI-Chester Defendants' exhaustion issue.

This grievance, which Beale filed on December 12, 2018, shows that U.M. Connor-Council was named therein, but D.S. Eason was not. *See id.* at 14. In his statement of his grievance, Beale indicated:

> Since the Last [sic] week of November (Nov. 25, 2018) it's been extremely cold in my cell. It's been so cold that my hands and feet are begining [sic] to crack and bleed. Since 'flatlining' in the Infirmary (Nov. 26, 2013) from being so cold there. I was given a Memo stating: "CR-CHS Captains; CR-CHS Admin. Staff; CR-CHS Department Heads; CR-CHS Medical Staff; CR-CHS Psychology; CR-CHS Unit Managers; CR-CHS Commissioned Officers 'He must remain warm at all times'". This has only happened when the water is hot in the showers (not often). According to Correctional Policy [sic], the DOC is required to provide "HEAT". It is unconstitutionally cold on the Unit. [sic] cells, and other areas the population is allowed to go. There is NO HEAT on CA Unit or in the cells.

*Id.* at 15. Beale also indicated that he had contacted Superintendent Lamas, D.S. Wahl, U.M. Selby, and U.M. Connor-Council about this issue. *See id.* For relief, Beale sought "[t]o have HEAT during the Winter/Cold days, constantly and consistently." *Id.*

U.M. Selby issued an Initial Review Response denying this grievance. *See id.* at 16. There was no reference to D.S. Eason in this response. *See id.* Beale then appealed to the Facility Manager, and his appeal statement included the first reference to D.S. Eason:

> Since October, I've been complaining about the cold temperature. I've written [U.M.] Connor[-]Council about it. I've complained to [D.S.] Wahl about it, but nothing had been done about it. I finally had to submit a grievance on it. It is a constitutional right for the DOC to provide heat. It is a necessity to sustain human life to provide heat in cold temeratures [sic]. If [U.M.] Selby made rounds in the entire facility and found it to be at an acceptable temperature, why is it that the staff was provided with small portable heaters. Why have staff contacted him several time from "CA" unit and complained that the Unit was too cold for them to work and they were provided with portable heaters. [D.S.] Eason and [U.M.] Connor-

68

> Council went to several cells on the bottom tier of "CA" unit and found it difficult to stay in those cells because of the coldness of them. I may sound a little smart here, but if [U.M.] Selby made rounds throughout the entire facility and found it to be at an acceptable tempreture [sic], Donald Trump does not lie.
>
> I have medical paperwork (E-Mail to CR-CHS Captains; CR-CHS Admin Staff; CR-CHS Department Heads; CR-CHS Medical Staff; CR-CHS Psychology; CR-CHS Unit Managers; CR-CHS Commissioned Officers) stating I must remain warm at all times.
>
> According to Policy DC-ADM 804 Section 1.C.3, it states, "The staff member who serves as the Grievance Officer shall not be directly involved in or named as the subject of the Grievance in **Section A and/or B** of the **DC-804, Part 1**. How is it that [U.M.] Selby became the Grievance Officer? He is the Head of Maintenance and directly involved with heating in this facility. He stated he "made rounds in the entire facility", therefore he is directly involved. He should not have been able to address this grievance.

*Id.* at 17. D.S. Wahl, "for M. Lamas," responded to the appeal, and upheld the initial response. *Id.* at 19. Beale appealed from that decision to SOIGA on or about February 2, 2019. *See id.* at 20–21. The disposition of this appeal is unknown because it is not included as an attachment to the Amended Complaint or the instant Motions, although Beale does allege that the Facility Manager's response was upheld. *See* Am. Compl. at ¶ 74.

Through this grievance and Beale's appeals, he has exhausted his Eighth Amendment claim regarding the cold temperatures as to U.M. Conner-Council. He stated that she was one of the individuals with whom he had spoken to about the cold temperatures and no relief was provided to him. As for D.S. Eason, he is not one of the individuals Beale specifically named in the grievance, and he was not mentioned in the Initial Review Response to the grievance. Thus, prison officials would not have been "on notice of the persons claimed to be guilty of wrongdoing." *Spruill*, 372 F.3d at 234. In addition, Beale's inclusion of a reference to D.S. Eason having visited cells and finding them to be cold as part of his first level appeal does not permit a finding of exhaustion here because of the exclusion of his name from the initial grievance and the Initial

Review Response.[58] Therefore, Beale has procedurally defaulted any claim against D.S. Eason based on the cold temperatures in early December 2018.[59]

           c.      <u>Beale's Asthma Medication Claim Against Nurse Ross</u>

The SCI-Chester Defendants assert that Beale has failed to exhaust any Eighth Amendment deliberate indifference claim he has against Nurse Ross relating to his inability to obtain his Singulair on October 6, 2020. *See* Defs.' Br. at 25. They point out that Beale never filed an appeal from the response by the Facility Manager. *See id.*; Defs.' SOF at ¶¶ 53–55. Beale opposes this part of the Motion by asserting that he did not have a reason to file an appeal from the Facility Manager's response. *See* Pl.'s Br. at ECF p. 101. The Court agrees.

Unfortunately, this is yet another occasion where the record does not contain a copy of the grievance and its associated documents. As such, the Court is constrained to referring to Beale's allegations in his Amended Complaint as to what occurred with his grievance relating to the October 6, 2020, as the SCI-Chester Defendants are not arguing that he did not grieve the issue. According to those allegations, Beale made a lengthy statement in his grievance in his attempt to have his Singulair on a daily basis until he no longer has asthma. *See* Am. Compl. at ¶ 188. This

---

[58] It is also highly unlikely that any prison official would have understood Beale's reference to D.S. Eason visiting cells, apparently including Beale's cell, and finding them cold to constitute an accusation of wrongdoing against D.S. Eason.

[59] It appears that Beale could have filed a grievance pertaining to D.S. Eason in accordance with his allegations in the Amended Complaint. Beale alleges that after finding the cells he and U.M. Connor-Council visited to be too cold, D.S. Eason "stated he would see what he can do." Am. Compl. at ¶ 64. Beale even showed him the "memo" indicating that he was to remain warm at all times. *See id.* at ¶ 65. If the allegedly cold temperatures did not improve thereafter, Beale seemingly could have filed a grievance, although the Court mentions this only as a possibility and not as stating that such a grievance would have had merit or supported an Eighth Amendment claim against D.S. Eason.

      The Court also notes that the only other quasi-allegation in the Amended Complaint connecting D.S. Eason with the cold temperatures is Beale's belief that D.S. Eason sent an officer-in-training into Beale's cell to take Beale's plastic thermometer on July 27, 2019. *See id.* at ¶¶ 107–08. There is nothing in the record showing that Beale filed a grievance relating to this incident.

statement included an assertion that Nurse Ross was at an April 15, 2014 hearing with Judge Baxter where the Judge questioned her as to why Singulair had to be reordered if Beale was under chronic care for asthma. *See id.* In Nurse Ross's Initial Review Response to the grievance, she approved his request to have Singulair on a daily basis and noted it had been reordered on October 9, 2020. *See id.* In doing so, she also disagreed with Beale's statements in his grievance pertaining to her being present at the hearing with Judge Baxter and even whether the Judge had any conversation with staff regarding Beale's Singulair. *See id.*

Apparently, Beale was dead set on proving to Nurse Ross that she was at a hearing with Judge Baxter in April 2014, so even though he obtained the relief he sought—his continued receipt of a daily dose of Singulair—he appealed Nurse Ross's Initial Review Response to the Facility Manager. *See id.* at ¶ 189. Unsurprisingly, when Beale received his Appeal Response from the Facility Manager (who apparently was Nurse Ross), it upheld the Initial Review Response and "stated the relief [Beale] was asking for was addressed and upheld in [Beale's] favor." *Id.* at ¶ 190. Thus, Beale once again got the relief he sought when he filed the initial grievance.

The SCI-Chester Defendants want this Court to conclude that Beale should have filed an appeal from the Facility Manager's Appeal Response to SOIGA and, since he did not do so, he has failed to exhaust his deliberate indifference claim against Nurse Ross. The Court declines to do so. Although Beale had no legitimate reason to file his second-level appeal to the Facility Manager, he surely would not have had a reason to file yet another appeal just to argue with SOIGA about whether Nurse Ross was at a hearing with Judge Baxter in 2014, which had nothing to do with the relief he sought in his grievance. Simply because Beale filed an unwarranted appeal from an approved grievance does not mean that he would have had to file another one from the Facility Manager's Appeal Response, which upheld the Initial Review Response in Beale's favor. The SCI-

Chester Defendants do not reference any case in support of their argument that Beale would need to appeal from an approved grievance to fully exhaust his administrative remedies under the PLRA. Accordingly, the Court is satisfied that Nurse Ross is not entitled to judgment as a matter of law on Beale's deliberate indifference claim against her based on her failure-to-exhaust argument.

### 2.    Beale's Substantive Claims

The Court will now turn to the SCI-Chester Defendants' arguments as to why they are entitled to summary judgment on Beale's substantive claims.

### a.    Eighth Amendment Claims for Exposure to ETS

The SCI-Chester Defendants argue that Beale cannot succeed on his Eighth Amendment claims against C.Os. Parker, Lyons, Goode-Williams, Winstead, White, DeVane, and Karasinski. *See id.* at 11–13. They assert that Beale has failed to show that (1) these defendants failed to investigate his concerns about ETS, (2) there was an ongoing problem with ETS at SCI-Chester, or (3) these defendants knew about a problem with ETS at SCI-Chester. *See id.*

Before addressing these arguments there are three preliminary notes. First, because of Beale's failure to exhaust ETS claims as to some of these individual defendants, his only remaining ETS claims are against C.Os. Parker, Lyons, and Lees.[60] As such, the Court only addresses the SCI-Chester Defendants' contentions as to Beale's ETS claims against these defendants. Second,

---

[60] In his brief, Beale appears to state that he has ETS claims against D.S. Eason, D.S. Wahl, Lt. Arais, U.M. Connor-Council, U.M. Bourne, U.M. Neally, Laws-Smith, Nurse Ross, and C.Os. Goode-Williams, Winstead, Lyons, Lees, Karasinski, Parker, DeVane, and Norris. *See* Pl.'s Br. at ECF p. 67. He does not identify where in the Amended Complaint he asserts factual allegations relating to ETS against D.S. Eason, D.S. Wahl, Lt. Arais, U.M. Connor-Council, U.M. Bourne, U.M. Neally, Laws-Smith, Nurse Ross, or C.O. Norris. Simply because Beale named these individuals as defendants did not excuse him from including factual allegations to support ETS claims against these defendants. Without such factual allegations of wrongdoing, Beale has preserved no ETS claims against these other defendants.

although the SCI-Chester Defendants reference C.O. White in their supporting Memorandum of Law, *see* Defs. Br. at 10, he is not a named defendant in the Amended Complaint. *See* Am. Compl. at ECF pp. 1, 4–8 (naming defendants in caption and identifying them in body of Amended Complaint).[61] Finally, for reasons unknown, the SCI-Chester Defendants' Motion does not seek relief for C.O. Lees on Beale's ETS claim, despite Beale alleging an ETS claim against him in the Amended Complaint. *See* Defs. Br. at 10 (referencing only C.Os. Parker, Karasinski, Winstead, White, DeVane, Goode-Williams, and Lyons); Am. Compl. at ¶ 40 (alleging ETS claim against C.O. Lees). Therefore, no matter how the Court resolves Beale's ETS claims against C.Os. Parker and Lyons, his ETS claim against C.O. Lees will move forward.

As for Beale's ETS claims against C.Os. Parker and Lyons, the Court disagrees with the SCI-Chester Defendants that there are no genuine issues of material fact relating to his ETS as claims against these defendants. "A prisoner may state an Eighth Amendment claim for exposure to levels of ETS that pose an unreasonable risk of serious damage to the prisoner's future health." *Spellman v. Sec'y Pa. Dep't of Corr.*, 751 F. App'x 251, 252 (3d Cir. 2018) (per curiam) (citing *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). In addition, a prisoner has a viable Eighth Amendment ETS claim if prison officials are "deliberately indifferent to a prisoner's existing serious medical needs caused by ETS." *Atkinson v. Taylor*, 316 F.3d 257, 266 (3d Cir. 2003) (citing *Weaver v. Clarke*, 45 F.3d 1253, 1256 (8th Cir. 1995)). Thus, there are ***two*** types of Eighth Amendment ETS claims recognized in the Third Circuit:

> The first is prospective. To allege that exposure to ETS unreasonably endangers his future health, an inmate must show (1) exposure to "unreasonably high" levels of

---

[61] Judge Smith previously stated as such in his Order addressing the SCI-Chester Defendants' Motion to Dismiss the Amended Complaint. *See* Sept. 15, 2022 Order at 2 n.2. Beale named C.O. White as a defendant in his original Complaint, *see* Compl. at ECF pp. 1, 4, but failed to name him as a defendant in the Amended Complaint. Beale acknowledges that C.O. White is no longer a defendant in this action. *See* Pl.'s Br. at ECF p. 76 n.6 ("White is not a defendant in this action.").

ETS contrary to contemporary standards of decency; and (2) deliberate indifference by the authorities to the exposure. *See Helling v. McKinney*, 509 U.S. 25, 35-36 (1993); *Atkinson*[, 316 F.3d at 262–63, 66]. The second concerns a current or pre-existing jury. To allege that ETS exposure has aggravated a pre-existing illness, a plaintiff must show (1) a sufficiently serious medical need related to the ETS exposure, [*id.* at 262] (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)), and (2) deliberate indifference by prison authorities. *Id.* at 266.

*Moore v. Durand*, No. 22-2915, 2023 WL 4884855, at *1 (3d Cir. Aug. 1, 2023).

Here, both the SCI-Chester Defendants and Beale focus on the elements for a prospective type of an ETS claim, even though neither of them appears to recognize that there are two possible standards for ETS claims. *See* Defs.' Br. at 10; Pl.'s Br. at ECF p. 67. They appear to do so because this was the standard used for Beale's ETS claim in his WDPA case. *See* Defs.' Br. at 10 (citing *Beale v. Wetzel*, No. 13-cv-00015, 2015 WL 2449622, at *6 (W.D. Pa. May 21, 2015)); Pl.'s Br. at p. 67 (citing *Beale v. Overton*, No. 13-cv-00015, 2015 U.S. Dist. LEXIS 67147, at *13–14 (W.D. Pa. Feb. 12, 2015)).[62] Although the overall allegations in the WDPA case appear to be somewhat similar to those in the instant case insofar as they appear to potentially support either type of ETS claim, it is unclear why the WDPA identified only the standard for a prospective type of ETS claim.

Regardless, the parties are mistaken insofar as they have proceeded as if there is only one standard for all ETS claims because, as just explained, there are two types of ETS claims with different objective components. *See Atkinson*, 316 F.3d at 262–69 (describing the two ETS claims and their different objective elements). Also, while Beale does not identify whether he is proceeding under one type or both types, his allegations in the Amended Complaint would seemingly support both types of ETS claims because he has alleged that (1) he was exposed to

---

[62] While the parties' citations are different, both refer to the same language insofar as Beale cites to a Report and Recommendations and the SCI-Chester Defendants cite to a Memorandum Order adopting the Report and Recommendations.

levels of ETS at SCI-Chester which pose him an unreasonable risk of harm to his future health and (2) prison officials were deliberately indifference to his existing serious medical needs, such as his chronic asthma, which he claims were aggravated by exposure to ETS. Therefore, the Court is placed in a situation where the SCI-Chester Defendants are clearly attempting to obtain summary judgment in their favor as to all ETS claims, but they have only briefed the standard for prospective ETS claims. Since it is not this Court's function to create arguments for a party (despite the requirement to liberally construe a *pro se* litigant's submissions), the Court will only address Beale's possible prospective type of ETS claim because the SCI-Chester Defendants' arguments only address that type of claim. As explained more below, there are genuine issues of material fact under this prospective type of ETS claim that would preclude the entry of summary judgment in favor of C.Os. Parker and Lyons.

The SCI-Chester Defendants argue Beale has failed to allege or produce any evidence that C.Os. Parker and Lyons "knew of any environmental smoke conditions that had been going on for any significant period of time, or that they refused to rectify or investigate claims of these conditions." Defs.' Br. at 11. They contend that Beale, as demonstrated by his deposition testimony, does not know whether C.Os. Parker and Lyons investigated his complaints of ETS. *See id.* (citing Defs.' SOF at ¶¶ 1–5, 15–18). They also assert that the record shows that "each defendant only had knowledge of 1, or in some instances, 2, incidents of ETS." *Id.* at 12. Thus, they believe that "[t]here is no showing of any ongoing problems with ETS at SCI-Chester and, certainly no showing that . . . the defendants had any knowledge of an ongoing problem with ETS at SCI-Chester." *Id.*

There are several problems with the SCI-Chester Defendants' arguments. First, when they point to Beale's purported deposition testimony about him being unaware as to whether C.Os.

Parker and Lyons investigated his complaints of ETS, they have mischaracterized and overstated this testimony. During his deposition, Beale explained that he knew that C.O. Parker did not investigate his claim of ETS because he could see from his cell whether she "g[ot] up from her desk and investigate[d]." Defs.' SOF, Ex. 1, Dep. of Thomas Beale ("Beale Dep.") at 22:10–14. He knew that she did not make a call during the time she was on the "block." *Id.* at 15–20. He also "confirm[ed] that she didn't go around the block and check." *Id.* at 23:8–9. What Beale could not do is attest to whether C.O. Parker *ever* spoke to someone about the ETS. *See id.* at 22:25–23:5. His inability to testify about what she could have possibly done does not take away from his observations that on the day in question, she did not investigate his complaint of ETS.

This same reasoning applies to Beale's testimony about C.O. Lyons. Beale testified at his deposition that he did not see C.O. Lyons conduct any investigation in the block after Beale complained about ETS on March 10, 2019, but that he was not aware of whether C.O. Lyons did so after he left the block. *See id.* at 33:5-7, 34:18-25–35:1. For the alleged ETS incident on April 25, 2019, Beale again did not observe C.O. Lyons conduct any investigation after Beale complained of ETS, but he could not state if he spoke to anyone after his shift. *See id.* at 47:10-11, 12-14; 48:4-16. Even though Beale could not testify as to acts C.O. Lyons may have taken while outside Beale's area of observation, he has stated enough to demonstrate a genuine issue as to whether C.O. Lyons conducted an investigation into his ETS claim. It will be up to the fact-finder to determine whether his observations were sufficient and credible.

Second, the SCI-Chester Defendants ignore Beale's verified Amended Complaint,[63] which, as Beale astutely points out, can be considered as an affidavit in determining whether a

---

[63] *See* Am. Compl. at ECF p. 117 ("I have read the foregoing Amended Complaint and Composition Books included as part of the Complaint [sic] and hereby verify, that the matters alleged therein are true, except as to matters alleged on information and belief, and, as to those, I

genuine issue of material fact exists at summary judgment. *See* Pl.'s Br. at ECF p. 76 n.5 (arguing

that because he verified Amended Complaint under 28 U.S.C. § 1746, his Amended Complaint "is

equivalent to an affidavit or declaration [that] may be considered as evidence supporting his claim

to survive summary judgment"); *McKay v. Krimmel*, No. 22-1302, 2023 WL 4231714, at *2 n.4

(3d Cir. June 28, 2023) ("A verified complaint may be treated as an affidavit with evidentiary

value at the summary-judgment stage. However, it cannot create a genuine dispute of material fact

if contradicted by the story told by discovery." (citations and internal quotation marks omitted));

*Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 100 n.1 (3d Cir. 2017) ("[W]e consider as

affidavits Walters and Kromenhoek's sworn verified complaints, to the extent that they are based

upon personal knowledge and set out facts that would be admissible in evidence."); *see also* Fed.

R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made

on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant

or declarant is competent to testify on the matters stated.").[64] In doing so, they have ignored

---

believe them to be true. I certify under the penalty of perjury that the foregoing is true and
correct."); 28 U.S.C. § 1746 ("Wherever, under any law of the United States or under any rule, . .
. any matter is required or permitted to be supported, evidenced, established, or proved by the
sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person
making the same (other than a deposition, or an oath of office, or an oath required to be taken
before a specified official other than a notary public), such matter may, with like force and effect,
be supported, evidenced, established, or proved by the unsworn declaration, certificate,
verification, or statement, in writing of such person which is subscribed by him, as true under
penalty of perjury, and dated, in substantially the following form: . . . If executed within the United
States, its territories, possessions, or commonwealths: 'I declare (or certify, verify, or state) under
penalty of perjury that the foregoing is true and correct. Executed on (date) (Signature).'").

[64] While Beale can properly rely on his uncontradicted factual allegations in his Amended
Complaint to show that a genuine issue of material fact exists, he cannot rely entirely on his
Counter-Statement of Material Facts Precluding the Entry of Summary Judgment because there
are several issues with this document. *See* ECF No. 179 at ECF pp. 19–57 ("Pl.'s SOF"). First,
Beale asserts purported facts without citing to the record where those facts have been established.
For example, Beale states:

---

> While at SCI-Chester, Beale was housed with five (5) to six (6) cellmates who were smokers, one of which he was housed with for a period of seven (7) to eight (8) months, and sometimes his cell would smell of ETS from his cellmates clothing (Third-Hand Smoke). The biggest problem Beale experienced on a regular basis was exposure to ETS when an inmate smoked in a neighboring cell and the ETS came into Beale's cell through the common vents in the cell chase connecting the cells. Inmates smoked in their cells on the daily basis, and SCI-Chester's officers rarely, if ever, took any action to stop the smoking indoors.

*Id.* at ¶ 87. Although these facts, if true, would be relevant to Beale's ETS claims, Beale does not cite to the place in the record where these facts have been established and his Counter-Statement is not an affidavit or a verified document. Moreover, a Counter-Statement was not Beale's opportunity to add allegations to those in his Amended Complaint. Therefore, the Court has not considered Beale's factual assertions that are unaccompanied by a citation to the record. *See id.* at ¶¶ 87–91, 93–94, 106, 148–51, 153–64, 218–19, 225, 232, 250–51, 257, 259, 273, 276–77, 280, 287.

Second, and this is an issue with Beale's submissions in general, although Beale asserts some facts with citations, he does not identify where those cited documents are located in the record. For instance, Beale states, "Defendant's [sic] in answering their Interrogatories and Admissions, denied that there is a 'smoking problem' here at SCI-Chester." *Id.* at ¶ 82 (citing "Eason Interr. Answers at 12)). Beale has supported this statement by referring to D.S. Eason's Answers to Beale's Interrogatories, but those Answers are not attached to Beale's Counter-Statement of Facts and he does not otherwise state where the Court could locate those Answers in the record. While the Court has attempted to locate documents Beale references, it is not the Court's obligation to parse through the more than 180 docket entries in this matter to see if one of them contains D.S. Eason's Answers to Beale's Interrogatories. Instead, it was incumbent upon Beale to identify where in the record those Answers were located if he was not going to attach the Answers to his response to the SCI-Chester Defendants' Motion for Summary Judgment. He has failed to do so here. *See, e.g., id.* at ¶¶ 83–84 (citing to "Officers Walked Out for Contraband Or Other Reasons, 2013 – 2022" without identifying place in record where this document was located).

This same issue is also applicable to several occasions where Beale references his grievances. Beale attached numerous grievances and accompanying documents as part of his almost 600 pages of exhibits he attached to his Amended Complaint. Simply citing to a grievance number, without indicating where the grievance is located, is wholly improper. *See, e.g., id.* at ¶ 95 (citing to "Grievance No. 665994"). Again, the Court has attempted to locate these grievances, sometimes unsuccessfully, but it was Beale's obligation to identify where in the record the grievance was located, not the Court's.

Finally, Beale cites to his composition books to support his claims, as he did in the Amended Complaint. *See, e.g., id.* at ¶ 107 (citing "Comp. Bk. 14, p. 75"). As explained *supra*, the text of the copies from those books is largely illegible, *see, e.g.,* Am. Compl. Exs. at ECF pp. 308–09, so without Beale providing some sort of interpretation about what is included in those books, they provide this Court with no evidentiary support for Beale's claims.

78

Beale's allegations in support of his claim that he was "expos[ed] to 'unreasonably high' levels of ETS contrary to contemporary standards of decency." *Moore*, 2023 WL 4884855, at *1.

In this regard, Beale alleged that SCI-Chester is supposed to be a "non-smoking, non-tobacco Institution." Am. Compl. at ¶ 21. Beale alleged numerous incidents occurring between late-February 2019 and late-May 2019 where he could smell and observe ETS in the air. *See id.* at ¶¶ 22–44. He further alleged that if he "wrote all the smoking acts that happened between 2019 and 2020, there would not be enough paper in [SCI-Chester] to contain such information." *Id.* at ¶ 52 (citing his composition books). He pointed out that he "is highly allergic to tobacco smoke and almost staff at SCI-Chester [knew] what could happen if [he] comes into contact with tobacco smoke." *Id.* at ¶ 22. Beale suffers from asthma, as confirmed in the medical records. Beale asserted that his exposure to ETS at SCI-Chester caused him to experience, *inter alia*, uncontrollable coughing, dizziness, side and chest pains, nausea, hives, and even an episode of passing out. *See id.* at ¶¶ 22–45. These factual statements are sufficient to establish a genuine issue of material fact whether he was subjected to unreasonably high levels of ETS at SCI-Chester. *See Beale*, 2015 WL 2449622, at *6 (finding similar allegations to be sufficient "to raise [Beale's] potential right to relief above a speculative level" as to prospective ETS claims at motion to dismiss stage (citing *Mearin v. Swartz*, 951 F. Supp. 2d 776, 781 (W.D. Pa. 2013))); *cf. Moore*, 2023 WL 4884855, at *2 (agreeing with district court that plaintiff failed to show exposure to unreasonably high levels of ETS to support prospective ETS claim where plaintiff only "vaguely state[d] that the events giving rise to his allegations occurred on twelve different dates over the course of three months"

and "neglected to allege any specific facts sufficient to plausibly demonstrate that his levels of ETS exposure were unreasonably high").[65]

Finally, and turning to the second part of Beale's prospective ETS claim—Defendants' deliberate indifference to his exposure to ETS—the SCI-Chester Defendants argue that Beale "must demonstrate that each defendant 'had actual knowledge of the serious conditions of Plaintiff's need to [avoid cigarette smoke],' 'knew that these conditions . . . had been going on for a significant period of time,' and 'refused to rectify the conditions.'" Defs.' Br. at 10 (alterations in original) (quoting *Beale*, 2015 WL 2449622, at *7). The problem with this argument is the second requirement they believe Beale has to show to demonstrate deliberate indifference, i.e., that C.Os. Parker and Lyons had to know that the ETS conditions had been going on for a significant period of time. While they accurately quote this language from *Beale*, that decision is an unpublished, nonprecedential decision, and it is very much unclear that such a showing is required.

---

[65] The Court also recognizes that this factor—exposure to unreasonably high levels of ETS—is objective. *See Helling*, 509 U.S. at 35 ("With respect to the objective factor [of the plaintiff's Eighth Amendment deliberate indifference ETS claim, the plaintiff] must show that he himself is being exposed to unreasonably high levels of ETS."). As such, it

> requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to ETS. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate.

*Id.* at 36. It is not difficult for this Court to determine that, taking Beale's allegations as true, it violates contemporary standards of decency to expose anyone unwillingly to the risk he complains of.

In setting forth the three requirements it determined Beale had to allege to satisfy the deliberate indifference element of his prospective ETS claim, the *Beale* Court cited to *Mearin v. Swartz*, 951 F. Supp. 2d 776 (W.D. Pa. 2013). *See* 2015 WL 2449622, at *7. In *Mearin*, the WDPA concluded that the plaintiff had sufficiently alleged that two defendants "were aware that [the plaintiff] was being exposed to unreasonable levels of ETS and declined to intervene or rectify the conditions" because he had

> alleged that, having been exposed to constant smoking, he made repeated requests to his Unit Managers—Swartz and Palya—to be housed with a non-smoking cellmate; that Swartz and Palya had "actual knowledge of the serious conditions of Plaintiff's need to be housed with a non-smoker cellmate;" that Swartz and Palya knew that these conditions complained of had been going on for a significant period of time; and that these Defendants refused to rectify the conditions.

951 F. Supp. 2d at 784. While the *Mearin* Court found those types of allegations to be sufficient, it did not state or suggest that every plaintiff asserting an ETS claim had to show that the defendants knew about the ETS conditions for a significant period of time. It also did not cite to any precedential decision (or any decision for that matter) imposing such a requirement on a plaintiff, and this Court has not located another decision, outside of another decision later entered in Beale's WDPA case, concluding that a plaintiff needs to show that defendants knew about the ETS over a significant period to assert a prospective ETS claim. *See Beale v. Overton*, Civ. A. No. 13-15, 2017 WL 8941208, at *8 (W.D. Pa. July 28, 2017) (citing *Mearin*), *report and recommendation adopted sub nom. Beale v. Overtone*, 2017 WL 4276747 (W.D. Pa. Sept. 27, 2017).

Presuming that a plaintiff need not show that the defendant knew about an ETS issue over a significant period of time, Beale demonstrates deliberate indifference here by showing that the defendant prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Farmer*, 511 U.S. at 837. As

to C.Os. Parker and Lyons, Beale has shown that there is a genuine issue of material fact concerning whether they were deliberately indifferent. Beale asserts that C.Os. Parker and Lyons were "well aware" of his "condition with Tobacco Smoke." Am. Compl. at ¶ 18; *see also* Beale Dep. at 23:20–24:25, 35:20–36:2 (testifying that C.Os. Parker and Lyons knew Beale was allergic to smoke). According to Beale, C.O. Parker saw him coughing uncontrollably due to the ETS and even acknowledged seeing ETS in the air, yet Beale never saw her investigate the source of the ETS. *See* Am. Compl. at ¶ 22. C.O. Lyons acknowledged that there was smoke and stated that it bothered him too, and even contacted Beale over the intercom to see if he was ok, but never investigated the source of the smoke and claimed that there was nothing he could do about it. *See id.* at ¶¶ 25–26. These episodes, when taken into consideration with Beale's statements about the severe symptoms he experiences (and experienced) when exposed to ETS, are sufficient to create a genuine issue of fact as to whether C.Os. Parker and Lyons were deliberately indifferent. Accordingly, they are not entitled to summary judgment in their favor on Beale's Eighth Amendment ETS claim.[66]

b.    Eighth Amendment Claims Relating to Cold Temperatures

The SCI-Chester Defendants contend that Beale has failed to show that D.S. Eason, C.O. Lees, or U.M. Connor-Council knew that there was an excessive risk to his health due to cold temperatures at SCI-Chester and were deliberately indifferent to that risk. *See* Defs. Br. at 13. Similar to Beale's ETS claim, the SCI-Chester Defendants have failed to move for summary judgment on behalf of a defendant against whom Beale has asserted a claim. In this instance, it is

---

[66] There may be an issue concerning Beale's ability to prove damages in the nature of future harm should he prevail at trial on this constitutional claim; however, should Beale be "unable to establish a right to compensatory damages, he may be entitled to nominal damages." *Atkinson*, 316 F.3d at 265 n.6 (citing *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir. 2001)).

D.S. Wahl. *See* Am. Compl. at ¶ 56 (alleging submission of Request to Staff to D.S. Wahl and U.M. Connor-Council concerning the cold temperatures at SCI-Chester); *id.* at ¶ 54 (alleging cold temperatures during entire period he has been incarcerated at SCI-Chester); *see also* Pl.'s Br. at ECF p. 79 (asserting he has a "Valid Cold Temperature Claim Against Eason, Wahl, Connor-Council, And [sic] Lees" (emphasis omitted)).[67] Thus, the Court cannot review Beale's cold temperatures claim against D.S. Wahl.

Concerning the other defendants, the Court has already explained that Beale failed to exhaust his administrative remedies and/or has procedurally defaulted on any cold temperatures claim against D.S. Eason and C.O. Lees. Therefore, the Court will only address the SCI-Chester Defendants' arguments as to Beale's claim against U.M. Connor Council.

The SCI-Chester Defendants contend that Beale's claim against U.M. Connor-Council was that he told her (along with D.S. Eason) that "his block was cold, citing his thermometer, to which neither allegedly responded." Defs.' Br. at 13 (citing Defs.' SOF at ¶ 40). They assert that Beale admitted that he did not allege that U.M. Connor-Council never conducted an investigation into his claim. *See id.* (citing Defs.' SOF at ¶¶ 40–41). In response, Beale argues that the SCI-Chester Defendants have misled the Court by mixing up his allegations. *See* Pl.'s Br. at ECF pp. 79–80. He points out that he alleged two separate events: (1) D.S. Eason and U.M. Connor-Council visited a unit in January 2019, and found the cells there to be too cold; and (2) he showed D.S. Eason his plastic thermometer on May 13, 2019, when D.S. Eason asked Beale how he knew the temperature in his cell. *See id.*; *see also* Am. Compl. at ¶¶ 64, 98–99. Beale also acknowledges that he would not know what U.M. Connor-Council did, if anything, in response to his complaints about the cold

---

[67] By pointing out that Beale appears to have an Eighth Amendment claim against D.S. Wahl pertaining to the cold temperatures, the Court is not indicating that Beale has a viable claim against D.S. Wahl.

temperature when she was not in his presence. *See* Pl.'s Br. at ECF p. 80. Nevertheless, he indicates that "the temperature did not change from the harshly cold temperatures before he complained." *Id.*

Although Beale is correct that the SCI-Chester Defendants conflate his allegations concerning different alleged events in their Memorandum of Law, he has failed to show that there is a genuine issue of material fact relating to his claim against U.M. Connor-Council regarding the cold temperatures.[68] Beale's claim against U.M. Connor-Council consists of (1) her being "well aware" of Beale's conditions with Raynaud's (which Beale asserts was caused by, and is/was affected by, *inter alia*, the cold temperatures, *see* Am. Compl. at ¶ 14; (2) Beale submitting a Request to Staff to her and D.S. Wahl about the "harsh temperature in his cell" on December 5, 2018, *see id.* at ¶ 56; (3) U.M. Connor-Council and D.S. Eason visited several cells on the bottom tier of "CA Unit" and "found it difficult to stay in those cells because of the coldness of them," *see id.* at ¶ 64; and (4) Beale showed his "memo" stating that he must remain warm at all times to U.M. Connor-Council and D.S. Eason, *see id.* at ¶ 65. These allegations, taken as true for purposes of summary judgment, do not establish a genuine issue of material fact because there is no evidence showing that Connor-Council failed to act in response to Beale's complaints. While the temperature may have remained cold in Beale's cell following his complaints, he needs to point to some evidence in the record showing that U.M. Connor-Council showed deliberate indifference by not acting in response to his complaints, despite knowing about his Raynaud's and his risk for

---

[68] The statement in the SCI-Chester Defendants' Memorandum of Law is inconsistent with their Statement of Undisputed Material Facts. *Compare* Defs.' SOF at ¶ 40 ("Plaintiff alleges that he complained of cold temperatures to Eason and Connor Council, and that ***he cited his thermometer to Eason, to which Eason did not respond***." (emphasis added), *with* Defs.' Br. at 13 ("Plaintiff alleges that he told Connor-Council and Eason that his block was cold, citing his thermometer, to which neither allegedly responded.").

harm due to the cold temperatures. There is no reasonable inference that can be derived from the continued cold temperatures in Beale's cell to U.M. Connor-Council's failure to act. Beale is purely speculating that she was deliberately indifferent to his complaints about the cold temperatures. It is equally as possible that she tried everything she could to resolve the cold temperatures but was unsuccessful as it is that she did not act in response to Beale's complaints. At bottom, Beale's evidence does not create a genuine issue of material fact that U.M. Connor-Council was deliberately indifferent to an excessive risk to Beale's health and, accordingly, she is entitled to summary judgment in her favor on this claim.

c.     First Amendment Retaliation Claims

The SCI-Chester Defendants argue that Beale's First Amendment retaliation claims against D.S. Wahl, D.S. Eason, Lt. Arais, U.M. Bourne, U.M. Neally, and C.O. Norris fail as a matter of law because he has not introduced any evidence to show causation between his alleged protected activities and adverse actions from these defendants.[69] *See* Defs.' Br. at 15–20. The Court will first set forth the law on these claims before turning to the SCI-Chester Defendants' arguments as to each defendant.

To establish a First Amendment retaliation claim pursuant to section 1983, a plaintiff must show that "(1) [they] engaged in 'constitutionally protected conduct,' (2) the defendant engaged in 'retaliatory action sufficient to deter a person of ordinary firmness from exercising [their] constitutional rights,' and (3) 'a causal link existed between the constitutionally protected conduct and the retaliatory action'" *Baloga*, 927 F.3d at 752 (quoting *Palardy v. Twp. of Millburn*, 906

---

[69] Although the SCI-Chester Defendants do not mention C.O. Norris or Nurse Ross in the heading for this portion of their argument in their supporting Memorandum of Law, *see* Defs.' Br. at 14, they do argue that both Defendants are entitled to summary judgment on Beale's First Amendment retaliation claim. *See id.* at 18–19.

F.3d 76, 80–81 (3d Cir. 2018)). As to the third element, a plaintiff must "demonstrate[] that [their] exercise of a constitutional right was a substantial or motivating factor in the challenged decision." *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001). If they do, "the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Id.*

If there is no direct evidence of causation, a plaintiff can establish causation through circumstantial evidence by proving either

> (1) an usually suggestive temporal proximity between the protected activity and the alleged retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link. In the absence of that proof, the plaintiff must show that from the "evidence gleaned from the record as a whole" the trier of fact should infer causation.

*Beyer v. Borough*, 428 F. App'x 149, 154–55 (3d Cir. 2011) (quoting *Lauren W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)). "The decision-makers must be aware of the protected conduct for it to be a substantial or motivating factor in a decision." *Id.* at 155.

The Court will now address Beale's claims against the aforementioned defendants.

### i.    *D.S. Eason*

Beale's claim of retaliation against D.S. Eason relates to him alleging placing Beale in the RHU on January 30, 2021, and when Beale's Z-Code was taken away in late-March 2021. *See* Pl.'s SOF at ¶¶ 252–59; Pl.'s Br. at ECF pp. 85–86. These acts were in retaliation for Beale writing the Article. *See* Pl.'s Br. at ECF pp. 85–86.

For Beale to show that there is a genuine issue of material fact on this First Amendment retaliation claim against D.S. Eason, he needs to point to some admissible evidence indicating that D.S. Eason was aware of the Article. Beale has failed to do so. During his deposition, Beale testified that no one told him that D.S. Eason ever read the Article, and he did not know whether

D.S. Eason ever read the Article. *See* Beale Dep. at 192:10–23. Beale also testified that after he

mailed the Article to Senator Kane, Senator Kane visited SCI-Chester and had a "stern talk" with

D.S. Eason and former Secretary of the Department of Corrections John Wetzel. *See id.* at ¶¶

152:14–24. Beale claims that he heard that the "stern talk" was related to the Article, but he refused

to say how he knew that this conversation occurred.[70] *See id.* at 154:2–10. Then, in his response

to the SCI-Chester Defendants' Motion for Summary Judgment, Beale claims, without citation to

any evidence of record, that D.S. Eason "was informed that Beale had written a paper entitled [sic],

'Indiscretionary Acts Of The D.O.C.' and that it reported how SCI-Chester handled the COVID-

19 pandemic, allowing fifteen (15) inmates to die." Pl.'s SOF at ¶ 252; *see also* Pl.'s Br. at 85

("Defendant Eason was informed by someone in the security office that Beale wrote

'Indiscretionary Act Of The D.O.C.'").

Overall, Beale never saw D.S. Eason read the Article or heard from him that he read or

even was aware of the Article. Beale's "evidence" that D.S. Eason became aware of the Article

due to Senator Kane's stern talk is inadmissible hearsay.[71] As is Beale's "evidence," which is not

in the summary judgment record, that D.S. Eason heard about the Article through someone in the

---

[70] During his deposition, Beale testified that Senator Kane's secretary, Nancy Love, texted Beale and told him that Senator Kane came and spoke with D.S. Eason and former Secretary Wetzel. *See id.* at ¶ 154:16–155:8. The SCI-Chester Defendants attached messages they obtained from Ms. Love and none of them reflect such correspondence with Beale. *See* Defs.' SOF, Ex. 8, ECF No. 156-8.

[71] Beale's attempt to connect the Article, Senator Kane, D.S. Eason, and Beale's placement in the RHU is nonsensical. Per the allegations in the Amended Complaint, Senator Kane visited SCI-Chester on two occasions, February 9, 2021, and then on August 13, 2021. *See* Am. Compl. at ¶¶ 221, 318. Unless Senator Kane visited SCI-Chester on a third occasion, he could not have discussed the Article with D.S. Eason prior to Beale being placed in the RHU because Beale alleges he was wrongfully placed in the RHU on January 30, 2021. *See* Am. Compl. at ¶¶ 215–18.

security office. At bottom, Beale has pointed to no evidence establishing a genuine issue of material fact connecting the Article with his placement in the RHU.[72]

As for the issues that occurred concerning Beale's Z-Code status, he attempts to link D.S. Eason and the Article because it was allegedly taken from Beale's cell while he remained in the RHU until February 12, 2021. *See* Beale's SOF at ¶ 73 ("Plaintiff did not admit 'that he does not have any evidecne [sic] that Eason saw or read 'Indiscretionary Acts Of The D.O.C.' The events that happened after the paper was confiscated/stolen, gave evidence that Eason read this article."). This attempt is also unavailing. Once again, Beale has pointed to no direct evidence that D.S. Eason saw the Article once it was taken from Beale's cell. Even if the Court could somehow determine that D.S. Eason saw the Article after it was taken from Beale's cell while he was in the RHU, Beale's circumstantial evidence connecting this event to his Z-Code status issues is far too attenuated from the taking of the Article from Beale's cell prior to February 12, 2021, when he did not start having issues with his Z-Code status until well more than a month later, March 23, 2021. *See, e.g.*, *Killen v. N.W. Human Servs., Inc.*, Civ. A. No. 06-4100, 2007 WL 2684541, at *8 (E.D. Pa. Sept. 7, 2007) ("Here, where several weeks elapsed between Killen's complaint and any adverse action, we cannot find that the time is "unusually suggestive."" (quoting *Est. of Smith v. Marasco*, 318 F.3d 497, 512 (3d Cir. 2003))). Beale has also not shown evidence of "a pattern of antagonism" by D.S. Eason that could be coupled with timing to establish a causal link. *Beyer*, 428 F. App'x at 155 (citation omitted). Per the allegations in the Amended Complaint, D.S. Eason's only involvement with Beale prior to the issues Beale experienced with his Z-Code status was

---

[72] There is another fundamental problem with Beale's attempt to connect D.S. Eason with his placement in the RHU. He has not pointed to evidence in the record showing that D.S. Eason directed that Beale be placed in the RHU and, in the Amended Complaint, Beale alleged that Lt. Arais was responsible for his placement in the RHU. *See id.* at ¶¶ 215–18.

when D.S. Eason upheld two Initial Review Responses which denied Beale's grievances. *See* Am. Compl. at ¶¶ 232, 247. This is not a sufficient pattern of antagonism to couple with the approximately six weeks between when Beale claims (without evidence) that D.S. Eason became aware of the Article to create a jury issue as to causation.

Without these means of circumstantial evidence to establish causation, Beale had to "show that from the 'evidence gleaned from the record as a whole' the trier of fact should infer causation." *Beyer*, 428 F. App'x at 155 (citation omitted). He has failed to meet this showing. While the Court recognizes that causation is a "factual issue," *Baloga*, 927 F.3d at 761, Beale's attempt to demonstrate a causal link between D.S. Eason's knowledge of the Article and his Z-Code status issues are pure speculation, and he has not demonstrated that there is a genuine issue of material fact as to causation which would warrant this claim against D.S. Eason going to a jury.

ii. *D.S. Wahl*

The SCI-Chester Defendants assert that Beale "does not allege any specific claims of retaliation against . . . [D.S.] Wahl, despite identifying them" as defendants in this portion of the Amended Complaint. Defs.' Br. at 19. They also note that Beale does not allege that D.S. Wahl "read, saw, heard about, or retaliated against him because of [the Article]." *Id.*

In response, Beale does not even attempt to argue that he is asserting a First Amendment retaliation claim against D.S. Wahl based on the Article. Instead, Beale argues that he has asserted that D.S. Wahl retaliated against him for submitting a Request to Staff and two grievances. *See* Pl.'s Br. at ECF pp. 88–89. While the Court expresses significant doubts that the Amended Complaint can be read as including such a retaliation claim or that Beale's asserted retaliation claim even makes sense, the SCI-Chester Defendants have not addressed it, even though they could have asked this Court for permission to file a reply brief in which they addressed Beale's argument.

Because the SCI-Chester Defendants took no action to address Beale's argument, the Court is left with no choice but to deny D.S. Wahl summary judgment on Beale's retaliation claim.

### iii.    *Lt. Arais*

The SCI-Chester Defendants argue that Lt. Arais is entitled to summary judgment on Beale's retaliation claim for the same reasons as D.S. Wahl, namely, Beale failed to allege a specific claim of retaliation against him and introduced no evidence that he "read, saw, heard about, or retaliated against him" because of the Article. *See* Defs.' Br. at 19. It is ironic that the SCI-Chester Defendants grouped the arguments in favor of D.S. Wahl and Lt. Arais together because the Court is faced with the same issue just discussed. Beale has responded to the Motion by arguing that his retaliation claim against Lt. Arais is based on Beale trying to access the courts and a grievance he filed. *See* Pl.'s Br. at ECF pp. 86–87.[73] The SCI-Chester Defendants have not addressed this argument. As such, even though it appears that Beale has not demonstrated that a genuine issue of material fact exists relating to a retaliation claim connected to the Article, the Court cannot grant summary judgment on this claim at this time.

### iv.    *U.M. Neally*

The SCI-Chester Defendants contend that U.M. Neally is entitled to summary judgment on Beale's First Amendment retaliation claim because Beale admitted that he did not know if she ever saw or even knew about the Article. *See* Defs.' Br. at 17 (citing Defs.' SOF at ¶ 77). Further, U.M. Neally indicated that she did not see or know about the Article. *See id.* (citing Defs.' SOF at ¶ 78). Beale has conceded that U.M. Neally is entitled to summary judgment. *See* Pl.'s Br. at ECF p. 99

---

[73] Beale appears to attempt to salvage a possible retaliation claim based on the Article by stating the Article "is a form of 'free speech' and is protected by the First Amendment to the United States Constitution." *Id.* at ECF p. 87. While the Article may be protected by the First Amendment, Beale points to no evidence in the record showing that Lt. Arais was aware of the Article.

n.8 ("Beale excludes Defendant Jaclyn Neally from this suit."). The Court will enter summary judgment in her favor.

v.     *U.M. Bourne*

Regarding U.M. Bourne, the SCI-Chester Defendants have characterized Beale's retaliation claim against her to relate to her not promptly removing his "AC Status" after he was released from the RHU in retaliation for an article she believed Beale wrote about her. *See* Defs.' Br. at 17. The SCI-Chester Defendants point out that Beale testified that he does not know this to be true, and he has no evidence to corroborate this claim. *See id.* at 17–18. U.M. Bourne has also indicated that she had never seen or heard of any article written about her at the DOC. *See id.* at 18. Moreover, Beale has not identified when U.M. Bourne would have seen this article. *See id.*

In his response, Beale once again has zigged when the SCI-Chester Defendants have zagged. Beale does not assert that he is claiming unlawful retaliation against U.M. Bourne based on the delay in removal of his A.C. Status or the Article. Instead, Beale proposes that he is asserting retaliation claims based upon U.M. Bourne (1) moving him to a cell where he could not see the Officer's desk or the mailbox after he had a misunderstanding with C.O. Brown when she took his Request to Staff to place it in the mailbox, (2) placing another unvaccinated inmate into Beale's cell after he had filed a grievance which resulted in an unvaccinated inmate being removed from Beale's cell, and (3) trying to place another unvaccinated inmate into Beale's cell after Beale's Z-Code status was reinstated after a hearing with Judge Conti. *See* Pl.'s Br. at ECF pp. 90–91. Due to the SCI-Defendants' lack of a response to these arguments, the Court cannot grant summary judgment in U.M. Bourne's favor on a cause of action Beale is not claiming he is asserting.

vi.    *C.O. Norris*

The SCI-Chester Defendants assert that Beale has claimed that C.O. Norris retaliated against him for submitting grievances by not allowing him to go to the library during commissary hour. *See* Defs.' Br. at 18. They argue that summary judgment is warranted in C.O. Norris's favor on this claim because Beale has failed to identify a grievance to which she retaliated against him, and he does not allege that she even knew about any prior grievances he filed. *See id.*

In response, Beale yet again asserted that his retaliation claim is different than the one identified by the SCI-Chester Defendants. He states that his claim is based on C.O. Norris retaliating against him because she knew he had a deadline in this case and refused to allow him to go to the law library. *See* Pl.'s Br. at ECF p. 87.

Although the SCI-Chester Defendants have not addressed this argument, Beale went too far in his attempt to contort a claim in the face of a compelling argument in favor of summary judgment. Beale's new retaliation theory does not correspond with his allegations in the Amended Complaint. More specifically, Beale is asserting that C.O. Norris knew Beale had a deadline (which he asserts is protected conduct) and then refused to allow him to go to the library. *See id.* However, in the Amended Complaint, Beale averred that C.O. Norris "told everybody on the Unit that commissary was on its way and she was not letting ***anyone*** out until commissary was complete." Am. Compl. at ¶ 338. Beale then had to "explain[] to [C.O.] Norris that he had a DEADLINE with the Eastern District Court, but she told [him] that commissary had to be completed before any Passes go out." *Id.*

Beale's own allegations show that C.O. Norris had already made the decision to not let any inmate, including Beale, go anywhere via a pass until commissary was complete ***before*** Beale mentioned to her that he had a deadline with this Court. He does not allege that she knew he had a

deadline in this case prior to making the decision to prevent inmates from leaving via their passes. To the extent he is trying to do so now, he has not pointed to any evidence in the record to support such a factual assertion. Further, to the extent that he is attempting to allege that she retaliated against him by reaffirming that he could not go to the library after he told her about his deadline, she could not have retaliated against him for his reference to a legal deadline (in a case she was not even involved in as of November 1, 2021) when she took the same action prior to learning about his legal deadline. Accordingly, C.O. Norris is entitled to summary judgment on Beale's First Amendment retaliation claim.

vii.    *Nurse Ross*

The final defendant for which the SCI-Chester Defendants seek summary judgment on Beale's First Amendment retaliation claim is Nurse Ross. *See* Defs.' Br. at 18–19. Beale has not responded to this portion of the Motion; thus, he has not pointed to any evidence in the record that show a genuine issue of material fact existed as to this claim against Nurse Ross. As the SCI-Chester Defendants point out, Beale's First Amendment claim against Nurse Ross was based on her "punish[ing him] for filing Complaint(s)/Grievance(s)." Am. Compl. at ¶ 407. There is no evidence in the record showing which complaints or grievances Beale is referring to, or even an indication as to how she retaliated against him.[74] As such, Nurse Ross is entitled to summary judgment in her favor on Beale's First Amendment claim against her.

d.    Equal Protection Claims

The SCI-Chester Defendants argue that D.S. Eason, D.S. Wahl, and U.M. Neally are entitled to summary judgment on Beale's Fourteenth Amendment equal protection claim. *See*

---

[74] Beale's allegations in the Amended Complaint do not establish a First Amendment retaliation claim against Nurse Ross. *See* Am. Compl. at ¶¶ 129–30, 132, 188–92, 405, 407.

Defs.' Br. at 20–21. Beale, who has already excused U.M. Neally from this lawsuit, has also "exclude[d]" D.S. Eason from this claim. *See* Pl.'s Br. at ECF p. 99 n.8. He does not address any possible equal protection claim against D.S. Wahl. *See id.* at ECF pp. 99–100. Instead, he now claims, for the first time, that he is asserting an equal protection claim against U.M. Bourne. *See id.* He claims to have done so because he "found [out] after the submission of his First Amended Complaint, that [U.M.] Bourne was in charge of the institutional 'moves'," which formed the basis for his equal protection claim. *See id.* at ECF p. 99 n.8. As such, he now claims that U.M. Bourne violated the Equal Protection Clause by not moving him from the third floor to the first floor in August 2021 after the elevator broke despite Beale having an elevator pass due to his asthma and all other inmates with elevator passes being moved to the first floor. *See id.* at ECF pp. 99–100.

The Court will grant summary judgment in favor of D.S. Wahl, D.S. Eason, and U.M. Neally on Beale's equal protection claim either because Beale has abandoned them or failed to address them in his response to the Motion for Summary Judgment. The Court need not address Beale's equal protection claim against U.M. Bourne; however, the Court must note that Beale has not included such a cause of action against her in the Amended Complaint and cannot just alter his claims on the fly without seeking leave of court (or the opposing parties' agreement) to do so.

e.    Beale's Claim against Laws-Smith

The SCI-Chester Defendants contend that the Court should enter summary judgment in favor of Laws-Smith because Beale has failed to show that she was personally involved in any constitutional violation. *See* Defs.' Br. at 21–22. Beale does not address this argument in his response. His factual allegations against Laws-Smith consists of his allegation that Dr. Robinson stated that she would order gloves for Beale in April 2019, and Beale submitted a Request to Staff to her in October 2, 2019, concerning the gloves. *See* Am. Compl. at ¶¶ 90, 113. Beale has not

alleged or shown that Laws-Smith, presuming she was tasked with ordering the gloves as alleged, never ordered the gloves or responded to his Request to Staff. At bottom, he had not identified any evidence to establish her participation in a constitutional violation. Accordingly, the Court will enter summary judgment in her favor.

## III.    CONCLUSION

For the reasons discussed above, the Court will grant Dr. Little's Motion for Summary Judgment. Regarding the SCI-Chester Defendants' Motion for Summary Judgment, the Court will (1) grant the Motion as to Beale's ETS claims against C.Os. DeVane, Karasinski, Winstead, and Goode-Williams; (2) deny the Motion as to Beale's ETS claims against C.Os. Parker and Lyons; (3) grant the Motion as to Beale's cold temperature claims against D.S. Eason, C.O. Lees, and U.M. Connor-Council; (4) grant the Motion as to Beale's First Amendment retaliation claims against D.S. Eason, U.M. Neally, C.O. Norris, and Nurse Ross; (5) deny the Motion as to Beale's First Amendment retaliation claims against D.S. Wahl, Lt. Arais, and U.M. Bourne; (6) grant the Motion as to Beale's equal protection claims against D.S. Eason, D.S. Wahl, and U.M. Neally; and (7) grant the Motion as to Beale's claims against Laws-Smith.

An appropriate order follows.

BY THE COURT:


/s/ John M. Gallagher
JOHN M. GALLAGHER
United States District Court Judge